# UNITED STATES *v.* MILLER ET AL.

No. 78.   Argued November 16, 17, 1942.—Decided January 4, 1943.

*Assistant Attorney General Littell,* with whom *Solicitor General Fahy* and *Messrs. Vernon L. Wilkinson* and *Roger P. Marquis* were on the brief, for the United States.

*Mr. Laurence J. Kennedy* argued the cause, and *Mr. Francis Carr* was on the brief, for respondents.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This case presents important questions respecting standards for valuing property taken for public use. For this reason, and because of an apparent conflict with one of our decisions, we granted certiorari.

The United States condemned a strip across the respondents' lands for tracks of the Central Pacific Railroad, relocation of which was necessary on account of the prospective flooding of the old right-of-way by waters to be impounded by the Central Valley Reclamation Project in California. For many years a proposal to initiate state reclamation works in this vicinity had been before the people of the state. In 1932 they voted approval and authorization of the project. It was, however, subsequently adopted by the United States as a federal project.

April 6, 1934, the Chief of Engineers of the Army recommended that the Government contribute twelve million dollars towards the project.[1] Congress authorized the appropriation in the following year.[2] December 22, 1935, the President approved construction of the entire improvement. In 1936 Congress appropriated $6,900,000

[1] Rivers and Harbors Committee Document No. 35, 73d Cong., 2d Sess., p. 5.

[2] Act Aug. 30, 1935, 49 Stat. 1028, 1038.

for it and in 1937 $12,500,000.[3] In August 1937 the project was again authorized by Congress.[4]

In his report for the fiscal year ending June 30, 1937, the Secretary of the Interior stated that Shasta, California, had been selected for the site of the Sacramento River dam. Its construction involved relocation of some thirty miles of the line of the railroad.

Portions of respondents' lands were required for the relocated right-of-way. Alternate routes were surveyed by March 1936 and staked at intervals of 100 feet. Prior to the authorization of the project, the area of which respondents' tracts form a part was largely uncleared brush land. In the years 1936 and 1937 certain parcels were purchased with the intention of subdividing them and, in 1937, subdivisions were plotted and there grew up a settlement known as Boomtown, in which the respondents' lands lie. Two of the respondents were realtors interested in developing the neighborhood. By December 1938 the town had been built up for business and residential purposes.

December 14, 1938, the United States filed in the District Court for Northern California a complaint in eminent domain against the respondents and others whose lands were needed for the relocation of the railroad. On that day the Government also filed a declaration of taking.[5] In this declaration the estimate of just compensation to be paid for a tract belonging to three of the respondents as co-tenants was estimated at $2,550, and that sum was deposited in court. On the application of these owners, the court directed the Clerk to pay each of them one-third

---

[3] Act June 22, 1936, 49 Stat. 1597, 1622; Act Aug. 9, 1937, 50 Stat. 564, 597. An additional appropriation of $9,000,000 was made by Act of May 9, 1938, 52 Stat. 291, 324.

[4] Act Aug. 26, 1937, § 2, 50 Stat. 844, 850.

[5] Pursuant to Act of Feb. 26, 1931, 46 Stat. 1421, 40 U. S. C. §§ 258a–258e.

of the deposit, or $850, on account of the compensation they were entitled to receive.

The action in eminent domain was tried to a jury. The respondents offered opinion evidence as to the fair market value of the tracts involved and also as to severance damage to lots of which portions were taken. Each witness was asked to state his opinion as to market value of the land taken as at December 14, 1938, the date of the filing of the complaint. Government counsel objected to the form of the question on the ground that, as the United States was definitely committed to the project August 26, 1937, the respondents were not entitled to have included in an estimate of value, as of the date the lands were taken, any increment of value due to the Government's authorization of, and commitment to, the project. The trial court sustained the objection and required the question to be reframed so as to call for market value at the date of the taking, excluding therefrom any increment of value accruing after August 26, 1937, due to the authorization of the project. Under stress of the ruling, and over objection and exception, questions calling for opinion evidence were phrased to comply with the court's decision. The jury rendered verdicts in favor of various respondents.

The three respondents who had received $850 each on account of compensation were awarded less than the total paid them. The court entered judgment that title to the lands was in the United States and judgment in favor of respondents respectively for the amounts awarded them. Judgment was entered against the three respondents and in favor of the United States for the amounts they had received in excess of the verdicts with interest. They moved to set aside the money judgments against them on the ground that the court had no jurisdiction to enter them. The motions were overruled. All of the respondents appealed, assigning error to the trial judge's ruling

with respect to the questions to be asked the witnesses, to his charge which had instructed the jury that, in arriving at market value as of the date of taking, they should disregard increment of value *due to the initiation of the project* [6] and arising after August 26, 1937, and three of them to his entry of money judgments for the United States.

The Circuit Court of Appeals reversed the judgment, holding, by a divided court, that the trial judge erred in his rulings and in his charge, and unanimously that the District Court was without jurisdiction to award the United States a judgment for amounts overpaid.[7] A majority of the court were of opinion the witnesses should have been asked to state the fair market value of the lands as of the date of taking, without qualification, and the judge should have charged that this value measured the compensation to which the respondents were entitled.

1. The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken.[8] The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.[9]

It is conceivable that an owner's indemnity should be measured in various ways depending upon the circum-

---

[6] The majority of the court below were in error in characterizing the ruling of the trial judge. They said: "To put it simply, the Court ruled that no evidence could come in as to sales of similar properties after August 26, 1937, and that qualified witnesses testifying as to the value of the land on the date of the taking must subtract from this valuation *any increment in value* after August 26, 1937." 125 F. 2d 78.

[7] 125 F. 2d 75.

[8] *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 326.

[9] *Seaboard Air Line Ry. Co.* v. *United States*, 261 U. S. 299, 304; *United States* v. *New River Collieries Co.*, 262 U. S. 341, 343.

stances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the "value," [10] the "market value," [11] and the "fair market value" [12] of what is taken. The term "fair" hardly adds anything to the phrase "market value," which denotes what "it fairly may be believed that a purchaser in fair market conditions would have given," [13] or, more concisely, "market value fairly determined." [14]

Respondents correctly say that value is to be ascertained as of the date of taking.[15] But they insist that no element which goes to make up value as at that moment is to be discarded or eliminated. We think the proposition is too broadly stated. Where, for any reason, property has no market, resort must be had to other data to ascertain its value;[16] and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not

[10] *Bauman* v. *Ross,* 167 U. S. 548, 574.

[11] *Boom Co.* v. *Patterson,* 98 U. S. 403, 408; *United States* v. *New River Collieries Co., supra,* 344.

[12] Orgel, "Valuation under Eminent Domain" (p. 56): "The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes." *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 81.

[13] *New York* v. *Sage,* 239 U. S. 57, 61.

[14] *Olson* v. *United States,* 292 U. S. 246, 255.

[15] 2 Lewis, Eminent Domain, 3d Ed., § 705; *Kerr* v. *South Park Commissioners,* 117 U. S. 379, 386; *Shoemaker* v. *United States,* 147 U. S. 282, 304.

[16] See *Monongahela Navigation Co.* v. *United States, supra,* 312, 328–9, 337–8; *Hanson Lumber Co.* v. *United States,* 261 U. S. 581, 589.

in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons.

Again, strict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case, as where the formula is attempted to be applied as between an owner who may not want to part with his land because of its special adaptability to his own use, and a taker who needs the land because of its peculiar fitness for the taker's purposes. These elements must be disregarded by the fact finding body in arriving at "fair" market value.

Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker.[17] Thus, although the market value of the property is to be fixed with due consideration of all its available uses,[18] its special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value.[19] The district judge so charged the jury, and no question is made as to the correctness of the instruction.

There is, however, another possible element of market value, which is the bone of contention here. Should the owner have the benefit of any increment of value added to the property taken by the action of the public authority in previously condemning adjacent lands? If so, were the lands in question so situate as to entitle respondents to the benefit of this increment?

Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings. One

[17] *Bauman* v. *Ross*, 167 U. S. 548, 574; *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195; *Olson* v. *United States, supra*, 256.

[18] *Boom Co.* v. *Patterson*, 98 U. S. 403, 408; *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 81.

[19] *United States* v. *Chandler-Dunbar Co., supra*, p. 76.

of these is that a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it.

This has begotten subsidiary rules. If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract.[20] Such damage is often, though somewhat loosely, spoken of as severance damage. On the other hand, if the taking has in fact benefited the remainder, the benefit may be set off against the value of the land taken.[21]

As respects other property of the owner consisting of separate tracts adjoining that affected by the taking, the Constitution has never been construed as requiring payment of consequential damages;[22] and unless the legislature so provides, as it may,[23] benefits are not assessed against such neighboring tracts for increase in their value.

If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the be-

---

[20] Lewis, Eminent Domain, 3d Ed. 686; Nichols, Eminent Domain, 2d Ed. § 236; *Bauman* v. *Ross, supra,* 574; *Sharp* v. *United States,* 191 U. S. 341, 351–2, 354; cf. *United States* v. *Welch,* 217 U. S. 333; *United States* v. *Grizzard,* 219 U. S. 180; *Campbell* v. *United States,* 266 U. S. 368.

[21] *Bauman* v. *Ross, loc. cit.* Congress has provided that in takings such as that here involved, benefits to the remainder of the tract shall be considered by way of reducing the compensation for what is taken. Act July 18, 1918, c. 155, § 6, 40 Stat. 911, 33 U. S. C. § 595.

[22] *Sharp* v. *United States, supra; Campbell* v. *United States, supra,* 371–372.

[23] *Shoemaker* v. *United States, supra,* 302.

ginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

In which category do the lands in question fall? The project, from the date of its final and definite authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents' lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after August 1937 because of the likelihood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation.

*Shoemaker* v. *United States,* 147 U. S. 282, is directly in point and supports this view, notwithstanding respondents' efforts to distinguish the case. There Congress, in

1890, authorized commissioners to establish a park along Rock Creek in the District of Columbia, and, for that purpose, to select not exceeding two thousand acres of land. In 1891 the commissioners prepared a map of the lands to be acquired, which was approved by the President as required by the statute. Proceedings were brought to condemn certain tracts lying within the mapped area. The Supreme Court of the District instructed the appraisers, whom the Act made the triers of fact, that they "shall receive no evidence tending to prove the prices actually paid on sales of property similar to that included in said park, and so situated as to adjoin it or to be within its immediate vicinity, when such sales have taken place since the passage of the act . . . authorizing said park . . ." The instruction was approved by this court.

The majority of the court below thought the case distinguishable in the view that the boundaries of the park were fixed by the Act of Congress authorizing the project and, therefore, it was known what land would lie inside, and what outside, the park from the beginning, and that land taken for the park should not have the benefit of an increase in value which adjoining land might enjoy through its proximity to the improvement. This, of course, would be true if the lines of the park had, in the beginning, been fixed, because property lying outside the boundaries of the park, and not intended to be taken, would be dissimilar from that lying within it, the one gaining value by proximity and the other gaining nothing from the fact that it was to be taken from its owner. Such was the ruling of the court in *Kerr* v. *South Park Commissioners,* 117 U. S. 379, 387. From the citation of that case in the *Shoemaker* opinion, the majority below inferred that the two presented like facts. But, in the *Kerr* case, the lines of the park had been determined, whereas, in the *Shoemaker* case, the Act authorized the appropriation of a fixed acreage within a larger area. Consequently any

land lying within that area was likely to be taken. If a tract happened not to be taken, because not within the limits finally fixed, it might show an increase in readily realizable market value by reason of proximity to the improvement. In the *Shoemaker* case, the court excluded any increment of value arising out of the fact that Congress had authorized the location and condemnation of land for the park, for the very reason that Shoemaker's property lay in the area within which the park was to be laid out. If, in the instant case, the respondents' lands were, at the date of the authorizing Act, clearly within the confines of the project, the respondents were entitled to no enhancement in value due to the fact that their lands would be taken. If they were within the area where they were likely to be taken for the project, but might not be, the owners were not entitled, if they were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken. In so charging the jury the trial court was correct.

The respondents assert that a different rule should have been applied in respect of severance damage, even if the court's rulings were correct as to the valuation of land taken. In the light of what has already been said, we find no merit in the contention.

The respondents also say that, whatever the criterion of value adopted by the federal courts, Congress has adopted the local rule followed in the state where the federal court sits; and they claim that the California rule is settled that fair market value at the date of taking is the standard of value, without elimination of any increment attributable to the action of the taker. We need not determine what is the local law, for the federal statutes [24] upon which reliance is placed require only that, in con-

---

[24] Act of Aug. 1, 1888, c. 728, 25 Stat. 357, §§ 1 and 2, 40 U. S. C. §§ 257, 258; Act of Apr. 24, 1888, c. 194, 25 Stat. 94, 33 U. S. C. § 591.

demnation proceedings, a federal court shall adopt the forms and methods of procedure afforded by the law of the State in which the court sits. They do not, and could not, affect questions of substantive right—such as the measure of compensation—grounded upon the Constitution of the United States.[25]

The respondents urge, further, that the reversal by the Circuit Court of Appeals is justified by the District Court's disregard of the practice of the California courts with respect to the production of opinion evidence as to market value, even though it was right as to the elements which must be excluded. They allege that, in California courts, an opinion witness must state his valuation as at the date of taking and the opposing party is at liberty, upon cross-examination, to elicit the facts on which the witness relied in arriving at that value. Counsel insist that if the Government was entitled to have the witnesses disregard any increment of value due to the Government's intention to construct the project, it could have developed, on cross-examination, how far the inclusion of any such element had affected the value stated. We think that probably under California procedure this would have been the better and more appropriate way to develop the basis of the witnesses' opinions. We do not feel, however, that if there was a disregard of the local practice in this aspect the error is substantial or worked injury to the respondents.

2. We think the court below erred in holding the District Court without power to enter a judgment against three of the respondents to whom payments in excess of the jury's verdicts had been made out of the funds deposited with the Court.

Examination of the Act of February 26, 1931,[26] discloses that the declaration of taking is to be filed in the proceeding for condemnation at its inception or at any later time.

---

[25] *Chappell* v. *United States,* 160 U. S. 499, 512–13; *Brown* v. *United States,* 263 U. S. 78, 86.

[26] *Supra,* Note 5.

When the declaration is filed the amount of estimated compensation is to be deposited with the court, to be paid as the court may order "for or on account" of the just compensation to be awarded the owners. Thus the acquisition by the Government of title and immediate right to possession, and the deposit of the estimated compensation, occur as steps in the main proceeding.

The purpose of the statute is two-fold. First, to give the Government immediate possession of the property and to relieve it of the burden of interest accruing on the sum deposited from the date of taking to the date of judgment in the eminent domain proceeding. Secondly, to give the former owner, if his title is clear, immediate cash compensation to the extent of the Government's estimate of the value of the property. The Act recognizes that there may be an error in the estimate, and appropriately provides that, if the judgment ultimately awarded shall be in excess of the amount deposited, the owner shall recover the excess with interest. But there is no correlative provision for repayment of any excess by the owner to the United States. The necessary result is, so the respondents say, that any sum paid them in excess of the jury's award is their property, which the United States may not recover.

All the provisions of the Act taken together require a contrary conclusion.[27] The payment is of estimated compensation; it is intended as a provisional and not a final settlement with the owner; it is a payment "on account of" compensation and not a final settlement of the amount due. To hold otherwise would defeat the policy of the statute and work injustice; would be to encourage federal officials to underestimate the value of the property with the result that the Government would be saddled with interest on a larger sum from date of taking to final award, and would be to deny the owner the immediate use of cash approximating the value of his land.

[27] See *Garrow* v. *United States,* 131 F. 2d 724.

Respondents assert that whatever the substantive right of the United States to repayment of the surplus, the District Court in rendering judgment against them deprived them of property without due process of law. We think the contention is unsound.

The District Court was dealing with money deposited in its chancery to be disbursed under its direction in connection with an action pending before it. The situation is like that in which litigants deposit money as security or to await the outcome of litigation. Notwithstanding the fact that the court released the fund to the respondents, the parties were still before it and it did not lose control of the fund but retained jurisdiction to deal with its retention or repayment as justice might require.

Denial of notice and hearing is asserted. But, while it is true that the court included the judgment of restitution in its general judgment in the condemnation proceedings without notice to the parties or hearing, the respondents made motions to set aside the judgment against them, and the court heard and acted on the motions. The respondents had full opportunity to urge any meritorious reasons why judgment of restitution should not be entered against them.[28] We think they were entitled to no more.

State courts have proceeded as did the court below, under analogous statutes,[29] and our decisions justify the District Court's action.[30]

The judgment of the Circuit Court of Appeals is reversed and that of the District Court affirmed.

*Reversed.*

---

[28] In the judgment originally entered, the court added interest from the date of payment of the moneys to the respondents. After hearing on the motions, the court modified the judgment to impose interest only from the date of the judgment in the eminent domain proceeding.

[29] Lewis, Eminent Domain, 3d Ed., § 843; *Carish* v. *County Highway Committee*, 216 Wis. 375, 257 N. W. 11.

[30] Compare *Baltimore & Ohio R. Co.* v. *United States*, 279 U. S. 781; *Northwestern Fuel Co.* v. *Brock*, 139 U. S. 216.