## LUDLOW et al. v. COLORADO ANIMAL BY-PRODUCTS CO.

No. 6298.   Decided May 5, 1943.   (137 P. 2d 347.)

224

See 5 C. J. S., Appeal and Error, sec. 1498; 39 Am. Jur., 306.

Rehearing denied August 3, 1943.

*Moyle, Richards & McKay,* of Salt Lake City, for appellant.

*Elias Hansen,* of Salt Lake City, for respondents.

McDONOUGH, Justice.

Plaintiffs instituted suit against defendant to permanently enjoin the reconstruction of defendant's rendering plant near Benjamin in the vicinity of plaintiffs' properties. The trial court found that the plant as operated was a nuisance, but denied injunctive relief and permitted plaintiffs to file amended pleadings to recover damages for depreciation of their properties occasioned by the maintenance of the nuisance. Defendant appeals from the judgment and decree wherein the plaintiffs are severally awarded damages for impairment of market value of their properties.

About 1933 the defendant corporation acquired the property of a brick manufacturing plant. For a while it used the property as a receiving station for dead animals, slaughterhouse offal, etc., preliminary to shipment to its rendering plants elsewhere. In the latter part of 1934 defendant installed some machinery and equipment, together with a cooker, to render animals. The cooker went into operation early in 1935. Dead animals were collected not only from the surrounding area, but from other parts of Utah. Defendant occasionally purchased a dead animal from one of the plaintiffs. No action was taken by plaintiffs to enjoin operation of the plant, and no complaint was made about the stench carried into the atmosphere from its operation, until after the old plant was destroyed by fire on April 8, 1937.

For a while after the plant burned, defendant reverted to the practice of using the premises as a receiving station for shipment of animals and animal products to other rendering plants. Shortly thereafter it began the reconstruction of the plant as a fireproof structure on a somewhat larger scale. Residents and property owners in the vicinity of the plant filed protests with the county commissioners, requesting that defendant be prohibited from rebuilding the plant, on the ground it constituted a stench nuisance. The manager of defendant corporation attended the meeting

with the residents and property owners on at least two occasions, and on June 8, 1937, he assured the board of county commissioners that the type of plant in the process of construction would be modern and sanitary, and that it would not be offensive in the least. Two months later, before the plant was completed, plaintiffs commenced this suit to enjoin operation and maintenance of the plant on the ground it would constitute a nuisance by reason of the "unwholesome smoke, gases, vapors, and stenches arising and resulting" from the rendering of carcasses.

The temporary restraining order granted by the court was subsequently lifted to enable the defendant to demonstrate that all objectionable features of the old plant had been abated and remedied. At the trial even witnesses for defendant admitted there was a stench from the operation of both the old and new plants which permeated the atmosphere and reached the properties of some of the plaintiffs intermittently, depending on the direction of wind and air currents.

There was ample evidence that the air was frequently befouled from the operation of the rendering plant. Various witnesses for plaintiffs testified that the odors from cooking carcasses went off into the atmosphere and reached the various properties of plaintiffs; that such odors were obnoxious to such a degree it was impossible to enjoy a meal when the wind carried the stench over to the homes of witnesses; that such condition existed both before the old plant was destroyed by fire and after the new plant was put into operation; that they were awakened at nights and rendered sleepless by the nauseous smell; and that the clothing of men working in the fields emitted an offensive odor for hours after exposure to the fetid air from the vicinity of the plant. Nearly all of the witnesses for plaintiffs testified that the stench was just as bad from the new plant as from the old one.

At the conclusion of the original trial the court entered a written memorandum of decision in which it found that

the operation of the plant constituted a nuisance, but held that plaintiffs should not have injunctive relief by reason of delay in applying for an injunction; and that in lieu of an injunction plaintiffs should be permitted to file supplemental pleadings to obtain damages for depreciation of their properties by reason of such nuisance. A supplemental complaint was filed, in which parties as to whom the action previously had been dismissed, were joined as plaintiffs. Plaintiffs alleged depreciation of the value of their properties by reason of the existence of the nuisance created by defendant's rendering plant. In the final judgment and decree, damages were awarded to all except one of plaintiffs.

There are 100 assignments of error urged by defendant and appellant, which raise questions as to pleading, evidence, and the law applicable to the facts proved.

We shall first consider the contention that there was no competent evidence that the operation of defendant's rendering plant created a nuisance either before or after the new plant was built. Among other things counsel for appellant argue that the evidence was undisputed that within a radius of several miles from the plant there were in existence at the time of the trial or there had been in existence several years previously, the following facilities and industries which defendant claims rendered the area an industrial rather than agricultural one: (1) A sugar factory; (2) a pea vinery; (3) two railroads; (4) a flour mill; (5) an alfalfa feed mill; (6) beet storage and loading chutes adjoining each railroad; (7) wool loading platforms; (8) a local brickyard; (9) livestock feeding yards; and (10) livestock loading pens on both railroads. On this appeal it is strenuously urged by defendant that such facilities made the region an industrial area, and potentially valuable chiefly for industrial purposes, and not for residential or agricultural purposes; that smells and odors emanating from defendant's plant are not the only obnoxious odors, there being the smell of decaying pea vines at the

pea vinery and the odor of beet pulp at the sugar factory during certain months of the year; and that such smells constitute mere incidents of an industrial area. Defendant argues that plaintiffs could not be injured any more than the general public, and that neither the odors from its plant nor its method of operation could constitute a nuisance.

Appellant points out that the trial court found that defendant's plant performs a useful service in disposing of carcasses in an efficient manner instead of allowing them to rot in the fields or to create a menace to health by shallow burial; that a plant of such character properly located is beneficial to the public. They contend, therefore, that the plant could not be located to serve a useful purpose except in an industrial area along a railroad where it could have proper shipping facilities; and that the conclusion of the trial court to the effect that the rendering plant was and is a nuisance as operated, is inconsistent with the aforesaid finding of fact.

Such contentions are untenable. The mere fact that an area is not incorporated in a city or town with zoning regulations does not warrant establishment of commercial institutions which emit the described stenches in such region where life thereby will be rendered unpleasant to the residents thereof. Nor does the fact that an industry may serve a useful purpose or produce commercial commodities warrant its location at a place which merely suits the convenience of the owner or operator, in utter disregard for the effect it has on the value or enjoyment of other properties.

We also must reject the argument that the existence of some of the facilities pointed out by counsel for defendants, made the region an industrial rather than an agricultural area; although in view of what we have said, the fact that a region actually may be industrial does not justify the creation with impunity of odors or stenches to an excessive degree which unreasonably annoy others in the legitimate use of their properties or in their occu-

pations, especially when such conditions depreciate the value of other properties in such area. The evidence shows that the sugar factory, pea vinery, stock-feeding yards and loading platforms are essential to the marketing of agricultural products and livestock. The region consists principally of farms on which there are homes and other buildings characteristic of rural life. In most instances the farms and livestock raisers reside on their farms.

Section 104-56-1, R. S. U. 1933 (same, U. C. A. 1943), defines the term "nuisance" and provides for injunction or damages:

"Anything which is injurious to health, or indecent, or *offensive to the senses,* or an obstruction to the free use of property, *so as to interfere with the comfortable enjoyment of life or property, is a nuisance and the subject of an action.* Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance; and by the judgment the nuisance may be enjoined or abated, and damages may also be recovered." (Italics added.)

Section 103-41-1 provides in part:

"Whatever is dangerous to human life or health, and whatever renders soil, air, water and food impure or unwholesome, are declared to be nuisances and to be illegal  *  *  *."

It could hardly be urged that the maintenance of a condition which is rendered illegal by legislative enactment under the police power of the state, could be said to be lawful merely because it is a result of the operation of an industry which in itself is lawful to operate when done in a lawful manner and at the proper place. When an industry is of such a character that it produces foul odors, those who are responsible for its operation have the duty to place it where it will not result in injury to the property of others. The mere fact that there may already exist in the area a condition which may be obnoxious to some persons, does not create a license for establishment of other more offensive conditions.

There can be no doubt about the fact that the operation of defendant's plant, by reason of the nauseating odors and stenches thereby produced, constituted an intermittent but frequently recurring nuisance within the meaning of our statutes. *Kinsman et al.* v. *Utah Gas & Coke Co.*, 53 Utah 10, 177 P. 418; *Wasatch Oil Refining Co.* v. *Wade*, 92 Utah 50, 63 P. 2d 1070; see also *Thackery* v. *Union Portland Cement Co.*, 64 Utah 437, 231 P. 813. Patently, if the smell of petroleum and petroleum products and artificial gas odors, discharged into the atmosphere so as to affect residents and property owners, constitutes a nuisance, the stench emanating from an animal rendering plant as described by the witnesses in this case, likewise constitutes a nuisance to property owners whose enjoyment of property is thereby affected.

In connection with its contention that there was a misjoinder of parties plaintiff, defendant apparently concedes that if the suit had been maintained solely for purposes of determining whether or not plaintiffs should have a decree enjoining operations of the plant as a nuisance, and the trial court had not permitted the injection of damages into the case, all of the plaintiffs as property owners whose properties were affected by the plant operations, might properly be joined as plaintiffs. Appellant takes the position that when the trial court denied injunctive relief it should have made findings of fact, conclusions of law and decree in favor of defendant, without prejudice to the right of each plaintiff to bring a separate action for damages. Appellant claims it was error for the court to allow the case to be reopened by filing a supplemental complaint. It argues that in the supplemental pleadings there are eleven separate causes of action for damages, no two of which are alike, and that as a result there is a misjoinder of parties plaintiff such as precluded defendant from having a fair trial as to each plaintiff.

The court decided there had been unnecessary delay in seeking injunctive relief after the nuisance was abated by

the fire, and until after defendant had spent considerable sums of money in reconstruction and enlargement of the plant facilities. However, as soon as plaintiffs discovered there was any intention to reconstruct the ■ plant they filed protests with the county commissioners, and defendant assured the commisisoners all of the objectionable features of the old plant would be eliminated. Plaintiffs did not cross-appeal, so we are not required to determine whether the court abused its discretion in denying an injunction. The court took the position that the case was not concluded upon determination of whether the nuisance should be enjoined. It expressly retained jurisdiction for purposes of final adjudication to afford complete relief betwen the parties and to avoid a multiplicity of suits. The practical effect of the court's ruling was that inasmuch as injunctive relief was within the discretion of the court, some other appropriate relief in lieu thereof might be granted. The trial court considered a proper solution would be just compensation by way of allowing each plaintiff the amount his property was depreciated by the recurrence of the nuisance.

Apparently the lower court relied on the case of *Kinsman et al.* v. *Utah Gas & Coke Co.,* supra. That case was cited with approval in *Wasatch Oil Refining Co.* v. *Wade,* 92 Utah 50, 63 P. 2d 1070. This court said (92 Utah at 64, 63 P. 2d at 1076) :

"The trial judge referred to the case of *Kinsman* v. *Utah Gas & Coke Co.,* 53 Utah 10, 177 P. 418, and seemed of the opinion that in this case he should follow the rulings of this court in that case. In the Kinsman case, 59 persons joined as plaintiffs in a suit to enjoin the operation of a gas plant. After trial the court made findings of fact, concluded the plant was a nuisance and should be enjoined, and entered a decree enjoining the operation of the plant after a specified date. On appeal this court sustained the findings of fact made by the trial court but held that the restraining order should not be granted against the operation of the plant because of delay of plaintiffs in bringing the suit but that the plaintiffs should have money damages in substitution for any equitable relief to which they were found entitled, and which would have been granted but for laches on their

part. The Kinsman case stands for this: That where the evidence shows actionable nuisance but there is an intervening fact such as delay on the part of plaintiff in bringing the suit so that the equity court will not enjoin the operation of the plant, damages will be assessed in lieu of equitable relief and that such damages will be fixed by the court in the exercise of its equity jurisdiction. The Kinsman case cannot now be disregarded and we have no desire to reverse or qualify any of the principles for which it stands."

In an equity action where the prayer is for both specific and general relief, such as for an injunction and "any further or other relief which the court shall deem appropriate in the premises," having once acquired jurisdiction of the parties and the subject matter, the court will retain that jurisdiction until full justice has been achieved between the parties, even if equitable relief is denied. This is especially true in this state where we have only one form of civil action, and various kinds of relief can be administered in the same action. Where a number of persons join in an action to restrain the operation of a plant or business as a nuisance, and also request general relief, if for some cause equitable relief is denied although the court finds there is actually a recurring nuisance; notwithstanding the nuisance would warrant each plaintiff in maintaining a separate action for damages for depreciation of his property, and the only separate issue is the amount of compensation due each plaintiff in lieu of injunction, it is proper for the court to allow plaintiffs so joined in the action to amend their pleadings or file supplemental pleadings and proceed to trial for determination of what compensation each plaintiff is entitled to receive, without requiring them to institute separate actions. *Kinsman et al.* v. *Utah Gas & Coke Co.,* supra, and *Wasatch Oil Refining Co.* v. *Wade,* supra.

Defendant further complains that the supplemental pleadings in effect constituted initiation of a new action in which there was misjoinder of plaintiffs, each having a separate cause of action for damages; for the suit was dismissed as to several of the plaintiffs when the court denied a per-

manent injunction, but they joined in the supplemental complaint and thereby came back into the case. Some of them were awarded compensation. In view of the language in the Kinsman case, and the fact the other parties similarly situated might have intervened by leave of court, we do not see how defendant was prejudiced in any manner. There is no contention that a defense materially different from the defense to the claims asserted by any of the other plaintiffs had to be prepared by defendant.

It is also urged that by allowing all plaintiffs to join and assert different claims for damages in the same action instituted originally for injunctive relief, the court deprived defendant of a jury trial. The contention must be rejected by reason of the position taken by defendant itself when plaintiffs requested a jury trial. Not only did the defendant fail to demand a jury trial, but the minutes show that on October 2, 1939, when plaintiffs demanded a jury for determination of the question of damages, the defendant resisted such demand. A party who takes a position which either leads a court into error or by conduct approves the error committed by the court, cannot later take advantage of such error in procedure. Constitution of Utah, Art. 1, sec. 10, provides that "A jury in civil cases shall be waived unless demanded." Section 104-23-6 and 104-26-1, R. S. U. 1933 (now U. C. A. 1943). If defendant had not waived a jury trial, it would have been proper to have had damages determined by a jury. *Wasatch Oil Refining Co.* v. *Wade,* supra.

Appellant also assigns as error the trial court's refusal to hold that action was barred by the pleaded statutes of limitations. Its position is that the nuisance, if it ever existed, was a continuing and a permanent one, and that the right of action arose immediately upon its creation and consequently it was barred at the date this suit was instituted. However, such argument overlooks the fact that the rendering plant did not commence operations as such until the early part of 1935. The plant was destroyed by fire a little over two years later. The shortest

period of limitations pleaded was three years. Not only was the nuisance effectually abated by the fire, but before the plant was reconstructed and placed in operation again this suit was commenced, which was within three years of the time the rendering of animals originally began. Furthermore, the trial court properly held that the nuisance was a recurring rather than a continuing one, and therefore very properly held that the statutes of limitations were inapplicable. *Thackery* v. *Union Portland Cement Co.,* 64 Utah 437, 231 P. 813.

There is considerable argument to the effect that the wrong method of computing damages was employed. The measure of damages for the maintenance of a recurrent nuisance is the depreciation of market value of the property affected. *Thackery* v. *Union Portland Cement Co.,* supra. The same measure of damages applies to permanent uninterrupted nuisances. See *Lewis* v. *Pingree National Bank,* 47 Utah 35, 151 P. 558, L. R. A. 1916C, 1260. It appears to be the view of appellant that the rule of diminution of market value was not properly applied. It is claimed that witnesses for plaintiffs made valuations from which they computed depreciation on some theory of absence of the plant structure and without reference to other existing industries, activities and facilities. However, at least one witness indicated he took into consideration the surrounding conditions, and he based depreciation solely on the odors emanating from defendant's plant. It appears that the trial court based depreciation on the frequent recurrence of stench, not on any assumption that the building and other physical structures of appellant as located constituted a nuisance. The findings and conclusions of the court indicate that in assessing damages the trial judge used the proper criterion—the difference in market value of each tract with its improvements without the stench nuisance existing, as compared with the value as affected by such odors.

It is claimed that the damages awarded are excessive in the light of all the evidence. For instance, it is pointed out that one witness testified that he depreciated all structures and other improvements on several tracts 100 per cent, and on other tracts 75 per cent, although such improvements so depreciated included pig pens, corrals and chicken coops. The findings of fact indicate that any extravagant assertions of any witness as to valuations or depreciation were disregarded by the court.

Appellant complains that both the valuations and the depreciation of plaintiffs' properties as found by the court are excessive. As to valuations it would be well to compare valuations found by the court with those determined by appraisers who testified for defendant. The valuations found by the court, absent the stench nuisance ▮ total $58,143.60 or only about 11 per cent higher than the valuations made by defendant's appraisers. Appellant's witnesses testified they did not consider there was any depreciation resulting from the disagreeable odors which permeated the atmosphere at frequent intervals, and their appraisals aggregate $52,421.60. The total depreciation allowed by the court to the respective properties aggregate $11,858.19, or a little over 20 per cent of the aggregate valuation of $58,143.60, which the court found the properties would have if there would be no stench, and 22.6 per cent of the valuations made by defendant's appraisers. In other words, the valuations of the properties as depreciated by the objectionable odors were found by the court to be $46,285.41, which aggregate of valuations of course is less than the valuations made by defendant's appraisers who allowed no depreciation at all for the stench. The trial judge viewed the premises, and he was in a position to determine the credibility of witnesses on the question of depreciation by reason of obnoxious odors, and properly weigh the evidence. The lowest depreciation allowed by the court was 13.2 per cent and the highest 48 per cent. The variances in percentages of depreciation appear to be

justified in view of the general direction of prevailing air currents and winds, and the respective distances of the several properties from the plant.

On cross-examination counsel for defendant directed attention of witnesses to the railroad tracks, the sugar factory, the pea vinery and other facilities and industries, so there does not appear to be any substance to the argument that such other industries or facilities were disregarded in arriving at valuations by the court. The trial judge viewed the premises and the area. There was ample evidence at the two trials to support the conclusion of the court that the region at that time was in fact an agricultural and cattle raising area, and depended on the facilities of the pea vinery as well as beet pulp from the sugar factory. Most of the witnesses testified that while on their own properties they could not detect any odor coming from the beet pulp plant or the pea vinery, so it may well be that it was not necessary to take such odors into consideration. The stench from the rendering plant was declared to be so much worse and so much more offensive than any other odor, that there was little if any possibility that the witnesses were actually confused as to the source of the offensive odors which made living or working on their properties so uncomfortable.

In the effort to show lack of diminution of market value of properties in question, appellant offered evidence that the lands produced just as abundant as well as just as great a variety of crops after the stench was created as before. Counsel also point out the fact that there are unpleasant odors to some degree on all farms, and contend that odors constitute incidents of agricultural life and production, and that market value could not be depreciated merely by presence of odors which do not impair productivity. The argument infers that productivity is the sole factor for determining market value, when it is merely a factor which has a bearing on value. Any nuisance is likely to impair property values, particularly if

it originates on the property of a third party whose operations are beyond the control of the injured parties. No argument is required to demonstrate that even if productivity of land is not diminished by a recurring nuisance, its sale value may be very seriously impaired. Ordinarily, people are not willing to pay as much for property plagued with a nauseating stench as for property free from such condition, especially when they are powerless to remedy the situation.

Counsel for appellant point out that on the premises of some of the plaintiffs there were filthy corrals, manure piles, rotting carcasses and other offensive conditions which produced disagreeable odors. Counsel claim that as a result, such plaintiffs were precluded from complaining about any stench created by the operations of defendant's plant. Inexcusable as such conditions might have been, there is no proof that they resulted in any damage to any other property or generally depreciated the neighborhood. Naturally such conditions would have a bearing on market value, and such conditions were called to the attention of the court. All of such objectionable features and unsanitary conditions could be remedied by the owners or occupants, while the stench from defendant's plant could not be abated by the individual plaintiffs. Furthermore, there was testimony that the odors produced on some of plaintiffs' properties did not surcharge the atmosphere, while the stench from the rendering plant was worse than any odor and permeated the atmosphere for a considerable distance.

In view of the fact that defendant's own witnesses valued the properties less than 10 per cent under the valuations determined by the court, absent the nuisance, it is not likely that the trial court failed to recognize depreciation resulting from the remediable conditions on plaintiffs' lands. The court had to determine the market value of the properties of each plaintiff as they existed with reference to all conditions other than the stench nuisance, and then determine the margin of depreciation which resulted from the frequent

recurrence of the obnoxious odors from defendant's plant. Considering the relatively small margin of difference between the values fixed by defendant's witnesses and the values determined by the court, absent the stench, it does not appear the court yielded to any excessive appraisals nor overlooked any of the elements which affect market value. As indicated by the United States Supreme Court in *United States* v. *Miller et al*, 317 U. S. 369, 63 S. Ct. 276, 87 L. Ed.____, exactitude in determining market value cannot be attained.

We do not consider there is any merit to the argument that several of the plaintiffs who sold dead animals to defendant which were rendered at that plant were thereby precluded from complaining about the odors produced by the plant. The new plant was not constructed merely to handle animals which died in that particular neighborhood. Defendant did not operate the plant as a sanitary convenience for the immediate neighborhood nor for the benefit of plaintiffs but as a commercial institution to gather as much from as wide an area as practicable. None of the plaintiffs either controlled the operations of the plant or in any manner determined what disposition should be made of any of the carcasses received there.

Appellant further alleges that the trial court erred in determining market value and in computing depreciation as of a time subsequent to the commencement of operations of the new plant, rather than when the cooker started operating in the old plant early in 1935. The basis of complaint is that some improvements were made on properties of certain plaintiffs after the first stench was created. As pointed out hereinabove, the nuisance was abated by destruction of the old plant by fire in 1937. Defendant persisted in rebuilding the plant on the old site notwithstanding protests were registered with the board of county commissioners. Defendant attempted to allay the fears and objections of the property owners by assur-

ing the commissioners that all objectionable features of the old plant would be eliminated in the operation of the new plant. The stench nuisance having been abated by the fire, if defendant had made good its assurances that the new plant would not produce the nauseating odors of which the property owners complained, the court could not have awarded depreciation for a recurring nuisance for the reason its recurrence would have ceased. We need not concern ourselves with what plaintiffs might have recovered for inconvenience and discomfort in the past.

The evidence clearly shows that the new plant did produce obnoxious odors, whether or not to the same degree as the old plant. When defendant built a fire-proof structure it manifested an intention to operate permanently. After defendant failed to make good its promises, and placed in full operation its new plant on a permanent basis, it became apparent that defendant would continue at frequent intervals to create such stench nuisance, and the court very properly determined depreciation as of the time when the new plant was in operation.

Objection is made to finding that John Anderson, Edward Ludlow and Margaret D. Hansen are owners of lands described in the supplemental complaint. No objection was made during the trial to any further proceeding on any theory that any of these people are not the real parties in interest, nor was there any effort to require the record owner to be made a party in any event. Counsel for defendant cross-examined plaintiffs and their witnesses on the assumption that the lands were actually owned by them as alleged, and even witnesses for defendants referred in their testimony to the lands as belonging to such plaintiffs. Edward Ludlow testified that while the record title is in his son, he holds a deed from his son. John Anderson admitted the title is in his wife's name, but he claimed ownership and testified that he purchased the property and paid for the improvements. As to Margaret D. Hansen the record shows that she owns a little over 19 acres and that she

is the surviving widow of Heber Hansen in whose name the balance of the acreage appears of record. In any event she has an undivided one-third interest in the lands in the name of Heber Hansen.

We agree with counsel for defendant that if damages are collected by a party for depreciation, defendant should not have to be subjected to another suit for the same depreciation. Where there are outstanding unrecorded instruments and the parties bring action as holders of such unrecorded instruments, before a judgment debtor or a party bound by a decree should be required to pay over the money, he is entitled to have such releases from the other spouse or from the holder of the record title as shall be necessary to prevent payment the second time. In this case the defendant is entitled to require the wife of John Anderson to join in the release as a condition to payment of the award, and to require the proper conveyance from the record owner of the Ludlow property to said Edward Ludlow to be recorded or a release from the record owner and his wife as a condition to payment of the award in that instance, and to require from the personal representative of the estate of Heber Hansen or the distributees of the real property in said estate a release or other evidence that Margaret D. Hansen is entitled to the entire award made on the property she claims to own.

With such modification the decree of the lower court is affirmed. Costs to respondents.

WOLFE, C. J., and LARSON and MOFFATT, JJ., concur.

PRATT, J., on leave of absence.