**UNITED STATES of America,**
**Plaintiff,**

v.

**5.27 ACRES OF LAND, MORE OR LESS, Situate IN WASHINGTON, et al., COUNTIES, STATE OF PENNSYLVANIA, and East Bethlehem Township, et al., Defendants.**

**Civ. A. 65–1356.**

United States District Court,
W. D. Pennsylvania.

July 27, 1972.

---

Joel B. Strauss, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Zeman & Zeman, Canonsburg, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

The basic facts in this eminent domain case are best apprehended by comparison of Exhibits A, B and C, three aerial photographs of the property involved taken in May, 1961, October, 1964, and April, 1967, respectively.

The United States filed its declaration of taking on December 20, 1965. It took easements to flood riparian properties from 758 feet above sea level to a higher level of 766, due to the effects of the Maxwell Dam project on the Monongahela River. Before the improvement, land at 760 was subject to occasional flooding, but at 780 was considered safe for the erection of buildings. The water level was raised on July 20, 1965, but by November 29, 1957 (Exhibit BB), public notoriety had been given to the contemplated raising of the water level.

The landowners here involved owned tracts shown as 702 and 628 on the photographs, together with an intervening tract subsequently acquired from the Penn Central Railroad in 1969 (Exhibit J). The property was located on Ten Mile Creek near its confluence with the Monongahela. The highest and best use of the property, both before and after the flooding, was as a marina.

Knowing of the planned flooding, and in order to minimize its impact on their property, the landowners undertook certain work on their land. They cut away a triangular portion of the north shore line of Tract 702, thus submerging it under the correspondingly widened Ten Mile Creek. From the southern edge of Tract 702 they dug a rectangular trench or inlet, which witnesses called a "lagoon". The material from these northern and southern excavations was used to elevate the middle, higher portion of the tract. When the water level was raised by the Maxwell Dam project, the lagoon was filled with water, and the high ground was above water. As shown on Exhibit C, the unsubmerged high ground extends eastwardly into the water in the shape of a trowel or pelican's bill. There is shore line on both sides of it, on the north along the widened Ten Mile Creek, on the south along the lagoon. On the south side of the lagoon there is a corresponding shore line.

The extent of shore line is valuable for marina use; and before the modification and flooding the only shore line was along Ten Mile Creek on the north edge of Tract 702.

Upon these facts the legal issues are based. Relying on the basic rule that value for just compensation is to be ascertained as of the time of taking, the Government contends that there was no taking at all of the triangular area which the owners dug away (resulting in the widening of Ten Mile Creek) *before* the flooding. Applying the "before and after" valuation rule as of the time of taking, the Government also seeks to inflate the "before value" by the amount of increased speculative value anticipated from the flooding after the work done by the owners, rather than determining such value before such work was done (since such work was done before the "time of taking"). The Government also argues that, by reason of such work, the "after value" in fact resulted in a benefit attributable to the condemnation, because new shore line usable for marina purposes was created by the flooding.

■ The pertinent principles of law are set forth fully in the opinion of Mr. Justice Owen J. Roberts in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). While approving the rule that value is to be ascertained as of the date of taking, the Court stated that the rule is not to be taken too literally (317 U.S. at 374, 63 S.Ct. 276).

Specifically, the Court held that changes in value due to the effect of the project itself, as originally announced, should be disregarded.

If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities. (317 U.S. at 376–377, 63 S.Ct. at 281)

The *Miller* principle was applied by the Third Circuit in United States v. 172.80 Acres of Land, 350 F.2d 957, 958–959 (C.A.3, 1965); and United States v. 959.68 Acres of Land, 415 F.2d 401, 402 (C.A.3, 1969). In the latter case it clearly appears that all 267 acres of a tract were condemned at the same time in 1965. However, the additional 131 acres not included in the original plan [1] were valued at an enhanced figure taking into account the increase between the 1957 disclosure of the original proj-

1. The Kennedy administration adopted a new policy of more comprehensive development of recreational facilities, resulting in an expanded and theretofore unanticipated taking. 415 F.2d at 403.

ect and the enlargement of the project in 1963. The 106 acres originally included in the project, however, were valued without regard to the effect of the project itself on land value.

This case therefore clearly demonstrates that changes subsequent to the original disclosure are to be disregarded, even if the formal taking itself occurs long after such disclosure. The rule that value is determined as of the date of taking cannot be applied in mechanical fashion.

Obviously the *Miller* principle is not a one-way street. When it is applicable it applies regardless of whether its application benefits the Government or the landowner. Intervening changes of valuation are to be disregarded whether they are increases or decreases. The movement of the market may be either up or down, but the valuation for just compensation purposes will disregard fluctuations either way.

■ We therefore conclude that, under the circumstances of the case at bar, developments subsequent to 1957, when the scope of the project was announced, are to be disregarded. Hence the landowners are to be compensated for the triangle shaped area which was submerged by their own activities after 1957 but before the actual taking or flooding when the higher water level became effective in 1965. The "before value" of the land taken is to be determined as of its extent in 1957.

It remains to translate these principles into dollar amounts. Tract 628 was substantially unaffected by the flowage. The Government's brief says 0.68 acres of Tract 628 were flooded.

Tract 702 embraced *in toto* 17.289 acres, and Tract 628 embraced 2.758 acres (Exhibit 2). According to the Government's brief, the triangular area was 3.5 acres, and the lagoon approximately 4 acres or a total of 7.5 acres; but 12.42 acres would have been flooded had no work been done by the owners.

According to Harry D. Ford, one of the owners, he concluded that 7 acres were taken by the flooding, and that 14 acres would have become swamp at water elevation 762. According to the Government's appraiser, 2.58 acres were flooded, taking the state of the land as it had been altered by the work done by the owner before flooding. The small peripheral inundation along the edge of both tracts at that time is shown in green on the overlay to Exhibit E.

As stated above, we consider the compensable taking to include not only the peripheral inundations on both tracts, but also the triangular area and the lagoon (which we compute from the foregoing figures as amounting to approximately 10 acres).

As a rough maximum and minimum on the average value per acre of land in the area, we may note the $3,333.33 per acre paid by the landowners to the Penn Central for the intervening tract which was absolutely necessary for the use of their tracts as a unit, and the $400 per acre paid by Edwards, one of the landowners, at the time of his original purchase in 1962 of Tracts 702 and 628. Since the acreage flooded was along the low edges of the tracts, where flooding occasionally had occurred before the improvement, a figure in the higher range would be inappropriate as a ceiling.

The landowners' appraiser gave a valuation of $66,000 before, $45,000 after, or damages of $21,000. The Government's appraiser for a taking of 13.1 acres, gave values of $8,700 and $9,000, or a benefit of $300.

■ We find and conclude, upon careful consideration of all the evidence, that the before value was $9,000; the after value $4,000, and the just compensation to be paid $5,000.

Judgment is entered in that amount in favor of the landowners and against the United States. This opinion shall be deemed to include the Court's findings of fact and conclusions of law.