KASHIWA, Judge,
concurring in part and dissenting in part:
I concur with the majority in its reversal of the trial judge on the underlying theory of plaintiffs relief under 28 U.S.C. § 1498 (1976). The grounds for reversal by the majority are well stated in subparagraphs A, B, C, D, and E of part II of the majority opinion. I also agree with the majority views with relation to plaintiffs recovery due to delay in payment expressed in part IV of the majority opinion.
I respectfully dissent from the majority view of damages to be awarded in this case expressed in subparagraphs B and C of part III of the majority opinion.
The majority in subparagraph A of part III states:
The comparative royalty technique is the preferred method of determining just compensation, Carley Life Float Co. v. United States, 74 Ct. Cl. 682 (1932). This is the method best suited to our needs and the facts available to us, although it is not perfect, and its flaws will be illustrated by our apparent difficulties in applying it to the facts of this case. * * *
The reason it is difficult to apply the comparative royalty technique to the facts of this case is that during the accounting trial plaintiff did not contend it was entitled to a reasonable royalty. Rather, it presented the solitary and novel theory that because it did not receive the procurement contract, the loss of funds that would have been paid to it under such contract caused it to decide to close the Leesona-Moos Division which, in turn, caused the loss of its investment in metal-air batteries. This novel theory was completely rejected by even the trial judge, and the trial judge decided the case on his own grounds. But the trial judge’s own grounds were thoroughly rejected by the majority in subparagraphs A, B, C, D, and E of part II of the majority opinion, as above mentioned. Plaintiff simply did not submit proper proof of damages to prove its case.
Defendant, on the other hand, argued for the award of a reasonable royalty and proved that in four licenses involving the patents in suit, or their foreign counterparts, *274 plaintiff received a 5 percent royalty. It was shown that these licenses also included know-how and additional patents. Furthermore, defendant also proved that in a tripartite license involving two of the patents in suit, plaintiff received only a 1% percent royalty. This latter license concerned a joint effort to develop technology relating to fuel cells. In addition, defendant presented evidence that RCA had negotiated a commercial license for a patent on magnesium perchlorate batteries used to power military radios for a 1 % percent royalty rate.
The majority has attempted to rescue plaintiffs case in subparagraphs B and C of part III by awarding plaintiff $266,712 on an entire market theory. I cannot see how such a theory can be adopted in the present case in that the trial judge found:
5. The packaged anodes, per se, prior to installation in the batteries, come within the scope of the claims of plaintiffs United States Patent 3,531,327, under which defendant has a royalty-free, nonexclusive license. When put to use in the batteries, the packaged anodes constitute indispensable elements of the infringed claims of the patents in suit.
This court found that such a license from plaintiff to defendant existed in the first Leesona case, 208 Ct. Cl. 871, 894, 530 F. 2d 896, 910 (1976). Plaintiff has not objected to the above finding. I believe the finding that the licensed patent aforementioned is indispensable to the metal-air batteries dispute herein makes the entire market theory inapplicable in this case. Assuming the figure $266,712 is correct for the purpose of this argument, however, should not Patent 3,531,327 above mentioned have some percentage of that amount credited to it? If so, what should the percentage be — 50 percent or 90 percent? Plaintiff has the burden of proof; it has failed in its proof. Plaintiff and the majority may argue that such proof is impossible. The impossibility makes the use of the entire market theory unavailable to plaintiff. Plaintiff cannot claim any damages under a patent which this court decided was licensed by plaintiff to defendant. A license is a complete defense.
My final objection to the majority’s finding of $266,712 damages, which the majority derives using a 10 percent royalty rate, is that the valuation methodology used by the *275 majority is contrary to the holding in United States v. Miller, 317 U. S. 369 (1943). Miller is fundamental in the law of federal eminent domain. In Miller the Court held that under the facts of that case, a "single project multitaking case” authorized by Congress in August 1937 with a total of $19,400,000 appropriated, the date of valuation of all properties taken under the project was August 1937, the date of authorization, and not any subsequent date. The filing date of the condemnation suit in the case before the Court was December 14, 1938, so plaintiff argued the valuation date should be December 14, 1938, because property values rose as a result of the Government project in early 1938. The Court held that the date of authorization of the project, August 1937, controlled. The pertinent parts of the decision are as follows [at pages 375-377]:
There is, however, another possible element of market value, which is the bone of contention here. Should the owner have the benefit of any increment of value added to the property taken by the action of the public authority in previously condemning adjacent lands? If so, were the lands in question so situate as to entitle respondents to the benefit of this increment?
* * * # *
If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.
The question then is whether the respondents’ lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the *276 meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government’s activities.
In which category do the lands in question fall? The project, from the date of its final and definite authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents’ lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after August 1937 because of the likelihood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation.
In other words, the rule prevents the owner from bootstrapping. In most cases the Government’s taking tends to increase values of the properties in the project. Owners are prohibited from taking advantage of such increases in value under the Miller rule.
In the present case the Marine Corps, after testing the metal-air batteries at Camp Pendleton and in Vietnam, decided, as the trial judge found in fact finding 14, as follows:
14. The Marine Corps requested authority in April 1969 to issue a negotiated Letter Contract to Leesona for procurement of 2,500 BB-626( )/U batteries, 753,456 anode-electrolyte composites, 3,000 cathodes (bi-cells), and 575 "blower” covers. Since detailed cost data was not available at the time, it was contemplated that a Defense Contract Auditing Agency audit would be conducted after submission of the cost data being prepared by Leesona. Consequently, a limit of $3,700,000 was placed on the proposed procurement, subject to reduction in light of the results of the DCAA audit.
Therefore, April 1969 was the date of authorization of the purchase of the 2,500 batteries, together with the above-mentioned accessories. Under the Miller rule, April 1969 is the cut-off date to determine fair market value of the patent rights taken by defendant via the defendant’s *277 eminent domain powers. It was one project, as in Miller, and the date of the decision to purchase was April 1969. Therefore, the majority’s computation of damages in subparagraphs B and C of part III is unsound. All the figures used by the majority came after April 1969 and the figures included added values to the metal-air batteries by reason of defendant’s procurement of the 2,500 batteries. Defendant is not liable under Miller for these added values because of the very procurement in issue in this case. Plaintiff is clearly not entitled to such bootstrap values.
I admit that in eminent domain just compensation must be determined from the view of what the owner lost, as the majority argues. This is elementary. But it is also elementary that the owner is only entitled to fair market value of what the owner lost. United States v. Miller, supra. The federal eminent domain law regarding fair market value when there is a "single project multitaking case” is clearly spelled out in Miller and fair market value must be determined as the Court determined therein.
As stated in part IV of the majority opinion, the signing of the procurement contract with Eagle Picher was not the taking; but the procurement of each battery and manufacture of the batteries for defendant by Eagle Picher constituted the taking. However, the valuation of the patent rights taken is determined as of April 1969 for eminent domain purposes because this case is typically a "single project multitaking case” as in Miller. All the evidence considered by the majority to conclude plaintiff was damaged in the sum of $266,712 was after April 1969, and such evidence cannot be used to determine damages in eminent domain proceedings. Miller clearly prohibits bootstrapping in such cases.
Therefore, returning to the only relevant evidence — the 1/z and 5 percent licenses plaintiff voluntarily granted— this court has before it upon which to determine a reasonable royalty, I find the 10 percent royalty rate the majority uses completely unfounded. I am of the opinion the 5 percent rate is the appropriate, reasonable royalty rate. That is the rate at which plaintiff voluntarily licensed a foreign competitor. And although both parties object to this rate, but on different grounds (plaintiff because it was a foreign license rather than a domestic license and *278 defendant because the foreign license included additional patents), that is the most credible royalty rate in the evidence before this court. The compensation plaintiff is entitled to receive is $41,169.86, plus interest on this amount for delayed compensation at the rate and for the period of time set forth in part IV of the majority opinion.
Concurrently with the foregoing opinion the court entered an order setting forth the modifications to and deletions from the findings of the trial judge whose findings were otherwise adopted by the court.