**UNITED STATES of America,**
**Appellant,**

v.

**William S. MUNZ, Appellee.**

**No. 19848.**

United States Court of Appeals
Ninth Circuit.

Oct. 30, 1965.

Richard L. McVeigh, U. S. Atty., Gerald J. Van Hoomissen, Asst. U. S. Atty., Anchorage, Alaska, for appellant.

Charles E. Cole, Fairbanks, Alaska, for appellee.

Before JERTBERG, DUNIWAY and ELY, Circuit Judges.

JERTBERG, Circuit Judge.

The Government appeals from a judgment in favor of appellee following trial to the court, in an action brought by the Government to recover civil penalties for violations of civil air regulations promulgated under the Federal Aviation Program of 1959, as amended.

The jurisdiction of the District Court was under § 1007(b) of the Federal Aviation Program of 1958, as amended, 49 U.S.C. § 1487(b), and 28 U.S.C. § 1345. This court has jurisdiction of the appeal under 28 U.S.C. § 1291.

We are concerned on this appeal with only two of the three offenses alleged in the complaint. The following facts are undisputed:

That at all times pertinent, the appellee, Munz, was the holder of a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board, and an Air Carrier Operating Certificate issued by the Federal Aviation Agency, and was, and for a number of years prior thereto had been, engaged in the aviation business operating charter flights and transporting cargo, with his headquarters in Nome, Alaska; that on or about August 16, 1960, Monarch Airways was the owner of a Lockheed 10-A aircraft which was covered by a Certificate of Airworthiness issued by the Federal Aviation Agency in the name of Monarch; that on or about August 16, 1960, the aircraft was utilized in a charter flight from Nome, Alaska to Kotzebue, Alaska and return; that the pilot of the aircraft on the charter flight was Paul Lazare, an employee of Monarch, and who was properly certificated by the Federal Aviation Agency as a pilot qualified to operate the type of aircraft which was utilized on the charter flight; that

for some period prior to the charter flight, the aircraft was kept on that part of the Nome airport used by appellee for his own aircraft and in the operation of his aviation business; that appellee furnished the gasoline used to propel the aircraft on the charter flight; that there was a landing accident on the Nome airport on the return flight from Kotzebue in which the aircraft was damaged; and that appellee signed and filed the aircraft accident report.

Specifically, the complaint charged that appellee: (1) operated the charter flight above mentioned, utilizing Lazare as a pilot at a time when current records were not maintained for said pilot, in violation of § 42.92 of the Civil Air Regulations (14 C.F.R. 42.92),[1] and (2) in utilizing the aircraft in question when the magnetic compass installed in said aircraft was not in serviceable condition because it did not have compensating information which could be used by the pilot for navigational purposes, in violation of § 42.21(a) (3) of the Civil Air Regulations (14 C.F.R. 42.21(a) (3).)[2]

The threshold and basic problem on this appeal is presented by the finding of fact made by the District Court that appellee was not the operator of the aircraft on the chartered flight above described. If the District Court was correct in making such finding of fact, it necessarily follows that the District Court properly concluded that the appellee did not violate the provisions of the Civil Air Regulations above quoted. If, on the other hand, such finding of fact is "clearly erroneous", it is the duty of this court to so declare. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Company, 333 U.S. 364, at 395, 68 S.Ct. 525, at 542, 92 L.Ed. 746 (1948).

Our study of the record in this case compels the conclusion that such finding of fact is "clearly erroneous." We reach such conclusion notwithstanding the fact that the District Court credited the oral testimony of the appellee that the signing of the Aircraft Accident Report by him as "operator" of the charter flight in question "was inadvertently made by defendant without thinking."

It is undisputed that appellee was the holder of a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board, and an Air Carrier Operating Certificate issued by the Federal Aviation Agency, and was engaged in the aviation business at Nome, Alaska, including operating charter flights under the name of Munz Airways.

49 U.S.C. § 1301(3) defines "air carrier" to mean

"any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation: * * *."

49 U.S.C. § 1301(26), in pertinent part provides:

"Any person who causes or authorizes the operation of aircraft, whether with or without the right

---

1. "§ 42.92:
   "An air carrier shall maintain at its principal operations base, or at such other location used by the air carrier as the Administrator may designate, current records of every airman utilized as a member of a flight crew. These records shall contain such information concerning the qualifications of each airman as is necessary to show compliance with the appropriate requirements prescribed by the regulations in this subchapter. No air carrier shall utilize any airman as a flight crew member unless records are maintained for such airman as required in this section."

2. "§ 42.21
   *Basic required instruments and equipment for aircraft.* The following instruments and equipment acceptable to the Administrator for the type of operations specified shall be installed and in *serviceable* condition in *all aircraft* * * *
   "(a) * * *
   "(3) Magnetic direction indicator," (Emphasis added.)

of legal control (in the capacity of owner, lessee, or otherwise) of the aircraft, shall be deemed to be engaged in the operation of aircraft within the meaning of this chapter."

The testimony of appellee discloses that several weeks prior to August 16, 1960, a telephone conversation occurred between appellee and Mr. Phillips, president of the Monarch Airways, with respect to the aircraft utilized in the charter flight above mentioned. On direct examination the following questions were asked appellee by this counsel, and the following answers given:

"Q Now, at one time did you have an agreement with him with respect to a Lockheed 10-A aircraft, Number N16054?

A Yes.

Q What were the circumstances leading up to the agreement between you and Monarch Airways with respect to this aircraft, and specifically I have in mind who called whom, or how—who got in touch with whom?

A Well, I had a long distance call from Mr. Phillips regarding the feasibility of bringing the aircraft up here and doing some work with it under certificate.

Q He called you, then, and what did you tell him?

A Well, through our conversation, why, I decided that the idea had merit, so we made a verbal agreement to go ahead with this.

Q Did you make the agreement there on the telephone, initially?

A Yes.

Q What was the agreement?

A Well, I was to charter the airplane from him at $25 an hour. He was to furnish the airplane and the crew, the pilot, and I was to take care of the gas and oil and the maintenance.

Q I see.

A And also his attorney was to draw up a lease.

Q Reduce it to—reduce the agreement to writing?

A To writing, correct."

\* \* \* \* \* \*

"Q Did you know who the pilot was going to be when the aircraft was sent up here?

A I didn't know the pilot. Mr. Phillips told be his name was Paul Lazäre.

Q Did you have any data in your possession or control with respect to this pilot's qualification to fly this aircraft?

A Yes, I did; a letter from Mr. Phillips.

Q What did Mr. Phillips say about the qualifications of the pilot?

A Well, he was an ATR pilot with the necessary rating. He had been checked out in the aircraft. He had been recommended by Mr. Phillips as a competent pilot.

Q Did you make any requests for that information from Mr. Phillips? Did he volunteer, or what were the circumstances?

A In the telephone conversation I wanted the information on the pilot, but also the information on the airplane, too.

Q Did you receive the information on the airplane, too?

A Yes.

Q When you received that were you satisfied that the pilot qualifications and the aircraft credentials, so to speak, were in proper form and order?

A Yes, I was."

On cross-examination the following testimony was elicited from appellee:

"Q You orally agreed with Mr. Phillips that you would use the plane, didn't you?

A Well, we agreed—when we agreed on the terms of the agree-

ment we had an oral agreement on the terms of this, whatever you want to call it, contract which was to be drawn up by his attorney.

Q You had agreed on all the terms that were to be in that contract?

A Yes.

Q As far as you were concerned, the only thing that remained was actually to draw up the papers and send it up here for you to sign?

A That's pretty much the situation.

Q But that never took place?

A That never took place."

Some time prior to the charter flight in question the same aircraft had been operated on a passenger carrying flight from Nome to Gamble, Alaska. Appellee could not recall who chartered the plane on that trip but to the best of his recollection it was a charter trip for which he might have supplied the gasoline. He could not recall whether he had received compensation for such flight.

Appellee further testified that during the flight in question from Kotzebue to Nome, he was informed that the aircraft was encountering difficulty. His testimony in this respect was as follows:

"Q Were you asked at any time to give advice regarding what the pilot should do?

A Yes, I was.

Q Did you give that advice?

A. Yes. Yes, I did.

Q What was your advice?

A I advised him to land at Tin City.

THE COURT: That was during the flight over the radio?

A Yes."

Following the accident, appellee, as required by the Civil Air Regulations, signed and filed on August 23, 1960, an "Aircraft Accident Report" dated August 19, 1960, with the Civil Aeronautics Board. Section XIII of the report is designated "OPERATOR'S STATE-MENT". Item 1. of the section bears the following printed provision:

"1. In accordance with CAR 62.36, describe circumstances of the accident and provide any additional information which may assist in the analysis of this accident and the prevention of similar ones. (Use supplementary sheet if additional space is required.)"

Then appears the following typewritten statement:

"The pilot of the aircraft refured (sic) to in this report was a FAA certified Multi-Engine pilot holding a current Instrument Ticket and a ATR. He had been checked out in the aircraft by a well qualified pilot and considered to be proficient by this pilot who was also the owner of the aircraft as well. While on the return portion of a charter flight from Nome to Kotzebue and return the pilot lost an engine shortly before reaching Shishmaref and elected to continue the flight to Nome on one engine a distance of approx 150 miles. Enroute he passed up six landing strips, three of which were suitable for DC-3 type aircraft. Altho advise (sic) to land at Tin City he failed to do so and made no attempt to land during daylight hours but disregarded practically all safe operating practices and arrived in Nome after dark, made an uncontrolled landing on the North-South runways at Nome, practically demolishing the aircraft with no apparent injory (sic) to the passengers. It is the considered opinion of the undersigned that the accident resulted from poor judgment on the part of the pilot. The following observation might well be applied to this mishap. 'Accidents just don't happen, they are planned'."

The report stated the owner of the aircraft was Monarch Airways, the pilot was Paul Lazare, the name of the operator for the flight was Munz Airways, with headquarters at Nome, Alaska, and

the class of the operator on the flight was "charter".

The initiation of arrangements for the charter flight to Kotzebue was made by one, Mr. Hoover as representative of the Miners and Merchants Bank of Alaska, in order to enable officers of the bank to attend ceremonies to be held in conjunction with the opening of a branch bank at Kotzebue, Alaska. In respect to the arrangements for the charter flight in question, the relevant portion of Mr. Hoover's testimony is as follows:

"Q   With whom did you make arrangements?   First, who did arrange for the flight on that day?

A   Mr. Munz.

Q   And who among the passengers dealt with Mr. Munz?

A   Myself.

Q   Do you recall when this was?

A   Not exactly.   It had to be a day or two before we went.

Q   What arrangements, if any, were made between you and Mr. Munz for the flight on the day in question?

[OBJECTION]

A   I would need to elaborate a little bit.   We were opening a branch bank on the 15th day of August at Kotzebue, and several of the people involved with the bank, plus a couple other people from the community, wanted to go to the branch bank opening.   I attempted to arrange a flight with Wien Airlines, who said they did not have a plane available.   I mentioned the fact to Mr. Munz that we wanted to go and would like to get up there.   It was just in passing, more or less, he said he knew where there was a plane. He said 'I know where there is a plane that will be available.'   We made arrangements to go.

Q   Did he indicate to you at this time where the plane was?

A   Parked at the Nome Airfield.

Q   Did he elaborate on that at all?

A   Pardon?

Q   Did he elaborate on the nature of the plane?

A   Well, he said, 'that Lockheed'. Of course I had seen it out there.

Q   Where was the plane parked, if you recall?

A   On the parking strip.   I think it was the north side of the Nome field.

Q   You may not know the answer to this question.   If you do know, you can answer it:   Do you know whether or not the plane was parked in an area which was used by Mr. Munz?

A   Yes, it was.

Q   It was parked in an area used by Mr. Munz?

A   Yes.

Q   I see.

A   Next to my own plane.

Q   Do you recall how long—

THE COURT:   Counsel, before you give that question, let us find out this:   Who chartered or who paid?   Did the bank, or who?

A   The bank did not pay for the charter.

THE COURT:   Oh.

A   We were not billed for the charter.

THE COURT:   Who paid for it?

A   I don't know.

THE COURT:   Was it politics, a business flight or something?

A.   Apparently.   We were never billed for the flight.

MR. HOLLAND:   If I might elaborate on that, your Honor.

BY MR. HOLLAND:

Q   I believe you have testified you made arrangements with Mr. Munz.

MR. COLE:   I object.   That's not what he testified to.

THE COURT: Here is what he testified to as I have it: He was speaking to Mr. Munz. He said he knew of a plane to go. He arranged to take this plane. If there was further conversation between you and Mr. Munz on this subject I would like to hear it as near as you can recall it, Mr. Hoover.

A The only other discussion that I recall was the discussion of the time we wanted to go, and it was arranged to leave the morning of the 15th of August and fly to Kotzebue.

THE COURT: This arrangement you speak of was made at the bank, or—

A I don't recall exactly where we discussed this.

THE COURT: You don't remember who was present?

A No. I don't.

THE COURT: Just you and Mr. Munz?

A As nearly as I can recall, it was just the two of us.

THE COURT: This was the initial contact?

A It was discussed with the Pilot, Paul Lazare, as to the time to leave.

*    *    *    *    *    *

Q I will rephrase the question. What arrangements did you have with Mr. Munz with respect to payment for the flight?

A None was made. We merely made arrangements to take the plane, that was all."

■ In light of the foregoing evidence, the District Court found that none of the arrangements for the flight were made with defendant and that while the aircraft had been flown to Nome in an-ticipation of the execution of a formal lease agreement between Monarch Airways and defendant, by August 16, 1960, however, there had been no meeting of the minds on the proposed lease of the aircraft and no lease agreement had been reached. In our view such findings are clearly against the great weight of the evidence and such findings are "clearly erroneous." It is our view that the evidence compels a finding that appellee was the person who caused or authorized the operation of the aircraft on the charter flight in question, either in the capacity of lessee or otherwise, and must be deemed to be the "operator" of the aircraft on the charter flight in question. As such operator he violated § 42.92 of the Civil Air Regulations since, admittedly, current records of Lazare, who was utilized as a flight crew member, were not maintained by appellee as required by said section.[3]

The District Court found as a fact that "the magnetic compass in the Lockheed aircraft utilized on the flight on August 16, 1960, was in serviceable condition. The evidence generally fails to sustain the allegation of the complaint that it was not in serviceable condition." From such finding the District Court concluded that appellee did not violate the provisions of § 42.21(a) (3) of the Civil Air Regulations on the charter flight in question.

■ We have carefully examined the evidence on this point and are unable to say the finding of fact of the District Court was "clearly erroneous." Under such circumstances the conclusions reached by the District Court with respect to such alleged violation must be sustained.

The judgment of the District Court is reversed with directions to the District Court to enter judgment in favor of the Government and against appellee in the amount of One Thousand ($1,000.00) Dollars.

3. § 42.1 of Part 42 of the Civil Air Regulations, 14 C.F.R. § 42.1, defines "flight crew member" as:

"Flight crew member means a pilot, flight radio operator, flight engineer, or flight navigator assigned to flight duty on the aircraft."