UNITED STATES of America, Appellee,

v.

**201.19 ACRES OF LAND, MORE OR LESS, IN GRAYS HARBOR COUNTY, STATE OF WASHINGTON, SIMPSON TIMBER COMPANY, et al., and unknown owners, Appellants.**

No. 26918.

United States Court of Appeals,
Ninth Circuit.

May 14, 1973.

Dale E. Kremer (argued), Ryan, Carlson, Bush, Swanson & Hendel, Seattle, Wash., for appellants.

Carl Strass, Washington, D. C. (argued), Stan Pitkin, U. S. Atty., Shiro Kashiwa, Asst. U. S. Atty., Kent Frizzell, Asst. Atty. Gen., Dept. of Justice,

Washington, D. C., Jerald Olson, Asst. U. S. Atty., Seattle, Wash., Ronald R. Hull, Asst. U. S. Atty., Tacoma, Wash., Dirk Snel, Robert S. Lynch, App. Section, Dept. of Justice, Washington, D. C., for appellee.

Before ELY, WRIGHT and WALLACE, Circuit Judges.

## OPINION

ELY, Circuit Judge:

Simpson Timber Company ("Simpson") appeals from a condemnation award of $51,408.00. It vigorously asserts that this sum inadequately compensates for the taking by the United States of a "permanent and exclusive" easement through timber lands located adjacent to the Olympic National Forest in the State of Washington.

In support of its timbering activities conducted on the Olympic Peninsula, Simpson founded a company town in the Wynoochee Valley. Christened Camp Grisdale, the town provides repair yards and railroad reloading stations, as well as housing and other employee facilities. Connecting the town to the outside world as it winds through the Wynoochee Valley is the gravel-surfaced Grisdale Road, a portion of which Simpson holds in fee simple absolute. This road provides not only the most convenient access to Camp Grisdale, but also the target of the condemnation and the subject of this appeal.

Although prior to the condemnation there was some limited use of the road by the public and the Forest Service. Simpson has continually exercised control over the road and its use. When, for example, the Forest Service requested a public right-of-way over the road during the 1950's, Simpson refused on the ground that expanded public use would adversely affect its logging operations. Simpson has used the road since the 1930's to move equipment and supplies incident to those operations. Moreover, due to Simpson's forestry management practices, it was quite definitely established that logging and concomitant traffic will increase substantially in the next ten to fifteen years.

A few years ago the Government approved the construction of a water storage and flood control dam across the Wynoochee River on nearby national park lands. The dam reservoir was intended for multipurpose uses, including recreation. Since the area would be accessible by means of the Grisdale Road, the Forest Service sought to obtain control through condemnation in order to improve the road surface and accommodate the anticipated traffic needs.

No suggestion is made that the condemnation itself was improper. The sole issue here raised is whether the amount awarded was so inadequate that it unconstitutionally deprived Simpson of property without just compensation. Specifically, Simpson contends (1) that the trial court's award was predicated upon erroneous interpretations of the Sustained Yield Agreement and the Declarations of Taking, and (2) that the trial court improperly rejected Simpson's appraisal testimony and relied solely on the testimony of United States appraisers who allegedly inaccurately evaluated the rights acquired and the damages suffered.

As a basis for fixing conpensation, the District Court sought to contrast Simpson's interest before and after the condemnation. In formulating this contrast, the court specifically found that (1) all the proposed public uses were already permissible under the Sustained Yield Agreement; (2) all scheduled improvements were similarly allowable under the Agreement; (3) Simpson's right to use Grisdale Road following its condemnation remained essentially unchanged; and (4) all of Simpson's future needs would be accommodated by the road as improved by the United States. These four determinations provided the bases for the challenged award made by the District Court.

Woven throughout the four findings is a 1946 Sustained Yield Agreement between Simpson and the United States.

Formally entitled "Cooperative Agreement for the Management of the Participating Forest Properties in the Shelton Cooperative Sustained Yield Unit," and authorized by 16 U.S.C. § 583 et seq., the one-hundred year contract was intended to stabilize forest industry employment in the area by implementing sustained-yield forestry.

## I

Underlying the first formulation was the court's observation that, construing the Agreement with "long established national public policy", Simpson and the Government "clearly" contemplated "continued public use" of Grisdale Road "throughout the term of the [Agreement] . . . and afterward."

■ We cannot agree with this interpretation, for the agreement expressly provides that the road would be available for public use *only* to the extent consistent with the objectives of the Agreement, Agreement at § 9, which included "continuous and sustained forest production," *id.* at § 2, and "growing the maximum volume of forest trees to sizes suitable for conversion of salable forest products in the shortest possible time . . . ." *Id.* at § 5. It was therefore clearly contemplated that any permissive public access to the road was to be subservient to the dominant purpose of forestry.

■ The District Court also sought to justify its first finding by reference to a 1957 amendment to the Agreement, which provided that Grisdale Road would be classed a general service road and thus

> "available for public use except when Company log traffic . . . is sufficiently heavy to constitute a definite safety hazard, in which case public use requirements may be met by the provision of alternate routes or by appropriate regulation of traffic after classification as Special Service roads under the procedure outlined in Regulation U–14, issued by the Secretary of Agriculture."

Since Regulation U–14 specifically provided that a road could not be classified as a "Special Service" road unless the Government already controlled the right of way, the Forest Service was without authority to, and did not in fact, route public use over Grisdale Road in derogation of Simpson's interests. Reference to the 1957 amendment was, we think, irrelevant to the formulation adopted by the court.

Similarly misplaced was the District Court's reliance upon "long established national public policy". The program relating to multiple use of national forests, thereby embracing recreational use, was not initiated until 1960; consequently it sheds no light on the intentions of Simpson and the Government as of the time of their 1946 agreement. Multiple-Use-Sustained-Yield Act, 16 U.S.C. § 528.

■ As a final basis for its first formulation, the court found "substantial prior public use" of the Grisdale Road. We cannot discern adequate substantial evidence to justify this finding. Even after the road became a general service road in 1957, the Government itself admits that there was "relatively little recreational use" with only about "300 people per season stay[ing] a full day or overnight" in the area, and most of these were local fishermen. At the time of condemnation, the entire acreage contained only one ten-unit campground.

■ In sum, we reject as clearly erroneous the finding that the public use anticipated after condemnation would not exceed the use already permitted.

## II

In its second formulation, the District Court found that the improvements now planned for Grisdale Road had ·already been contemplated and authorized by the terms of the Agreement. Consequently, according to the court, no injury to Simpson would be occasioned by postcondemnation improvements because they would not increase the use rights already exercisable by the United States.

■ The record does not support this conclusion. First, the Agreement itself contains absolutely no language supporting the interpretation under discussion.

Secondly, the practices that had actually been followed undercut the finding. Prior to condemnation, for example, all road construction and maintenance costs were borne initially by Simpson and were only indirectly reimbursed by the Government. In fact, as the Government's brief declares: "Forest Service officials believed that only the acquisition of a permanent easement over the [Grisdale] roads would enable them to make direct maintenance and construction expenditures. . . ."

█ We cannot avoid the conclusion, contrary to that reached by the District Court, that road improvements, inasmuch as they will enlarge the Government's prior use, will inflict compensable loss on Simpson.

### III

█ The third formulation, that Simpson's use rights to the road were not adversely affected by the taking, was predicated upon a finding that the Declaration of Taking did not diminish use rights secured to Simpson under the Agreement. The overwhelming evidence was to the contrary.

Prior to condemnation, for example, Simpson could have devoted Grisdale Road solely to logging and, if necessary, could have excluded the public entirely. After the taking, in contrast, Simpson was not to "interfere with the United States of America or its assigns, or create unsafe conditions . . . ."

Similarly, although Simpson's trucks were formerly equipped with all sized bunks and often hauled loans up to 160,000 pounds, with over half the loads exceeding 115,000 pounds, trucks were to be limited, after the condemnation, to ten foot bunks and loads of 115,000 pounds.

Moreover, the United States is now empowered, and in fact intends, to surface Grisdale Road with blacktop. Since Simpson is now liable for all road damage

it causes, and since it is undisputed that normal logging operations with Simpson's heavy equipment would inflict continuous and substantial damage, blacktopping would render Simpson's use of the road economically unfeasible.

Finally, in abrogation of Simpson's rights under the Agreement (which, incidentally), was not incorporated into the Declarations of Taking) and in expansion of governmental interests, the United States was given "perpetual and exclusive easements to construct, reconstruct, improve, use, control and maintain roads for [its own benefit and for . . . it assigns, contractors, licensees and permittees." Acting upon these new grants, the Government has classified Grisdale Road as a special service road and has issued regulations that require permits for commercial hauling,[1] apply state traffic laws to the road, and empower the Forest Service to close the road entirely to all commercial hauling, including Simpson's, merely by posting a notice.

These radical changes in actual and potential road use rights reflect the substantial adverse impact of condemnation on Simpson and amply demonstrate, we think, the clearly erroneous nature of the third critical finding made by the District Court.

### IV

█ The fourth basis for the District Court's conclusion was that Simpson's future needs would be fully accommodated by the road planned by the Government. The court was apparently convinced that the following reservations of use, in the Declaration of Taking, was sufficient to secure Simpson's future needs:

"[Simpson reserves the rights to] cross and recross the easement and roads at any place and by any reasonable means and for any purpose in such manner as will not unreasonably

---

1. The trial court apparently believed that Simpson was excepted from the permit requirement. We have been unable to

discover any indication of such an exception, either express or implied.

**1046**

interfere with use of the roads by the United States . . . and to conduct thereon such logging operations as will not interfere with the use of the roadway by the United States of America or its assigns or create unsafe conditions. . . . "

We take note, however, that the complexion of the description, "reasonable," may change markedly when applied in different circumstances. Thus, a practice quite reasonable for a logging road may become wholly unreasonable when the road may be utilized for tourist access to recreational areas. Governmental discretion to limit Simpson's use of Grisdale Road cuts well into the vested rights that Simpson exercised prior to condemnation. Accordingly, it is not only possible, but also likely, that Simpson's future needs may not be accommodated by the new road. Any "rights" reserved to Simpson by the Declarations of Taking are at most illusory and should not have been considered in fixing a just amount of compensation. United States v. 339.77 Acres of Land, 420 F.2d 324 (8th Cir. 1970); United States v. 677.50 Acres of Land, 239 F.Supp. 318 (D.Kan. 1965).

■ Having thoroughly reviewed the record, we are left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); United States v. Munz, 352 F.2d 196 (9th Cir. 1965). Although we do hold that the Government appraisers and the trial court adopted a clearly erroneous basis for the condemnation award, we think it unnecessary, going further, to specify the method of valuation that should be applied. The District Court will, of course, disregard the vague and gratuitous promissory declarations offered by the United States as establishing its limited future use of the condemned property. Rather, the award should be predicated upon the entire use to the Government that is possible, including all incidents of such use, and the reasonably

possible encroachment of that use upon the rights of the condemned. Beyond this, we defer to the wisdom and experience of the District Court in fashioning the approach most sure to compensate Simpson with "the full and perfect equivalent in money of the property taken." United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943).

Reversed and remanded.