**MUNRO DRYDOCK, INC., Plaintiff**

and

**United States of America,
Plaintiff-Intervenor**

v.

**M/V HERON, her engines, equipment, tackle, apparel and furniture and Associated Marine Services, Inc., Defendants.**

**Civ. A. No. 77–2329–T.**

United States District Court,
D. Massachusetts.

March 22, 1979.

Esdaile, Barrett & Esdaile, Charles W. Barrett, Jr., Charles J. Murray, Boston, Mass., for plaintiff.

Kneeland, Kydd & Handy, Frank H. Handy, Jr., Boston, Mass., for Marine Power and Equipment Corp.

Mary Brennan, Asst. U. S. Atty., Boston, Mass., and Emmett B. Lewis, Trial Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for the U. S.

Edward F. Harrington, New Bedford, Mass., for Edward Sanchez, Jr.

OPINION

TAURO, District Judge.

By remand of the Court of Appeals this court has been mandated to re-

view its September 15, 1978 order confirming the auction sale of the M/V Heron.[1] Consistent with that mandate, this court held an extensive evidentiary hearing in order to establish a precise record of the facts leading up to the sale and confirmation. Among those who testified were two appraisers called by the Government and one person appointed by this court as an impartial appraiser. As shall be demonstrated below, that hearing established that there was no basis for the material factual representations made to and relied upon by the Court of Appeals in issuing its remand order. This is particularly so with respect to the likelihood of an upset bid being filed.[2] Moreover, this court finds that the appraisal report presented to the Court of Appeals was unreliable.[3]

Under these circumstances, a detailed exposition of the facts established at hearing is both appropriate and necessary.

## I.

### Government's Representation as to an Upset Bid

On order of this court, the M/V Heron was offered for sale at public auction on September 12, 1978. Three bidders were among the approximately 10 persons present at the sale. The highest bid was proffered by one Edward Sanchez, Jr. (Sanchez) in the amount of $7500.

Two days later, on September 14, 1978, the United States, a preferred mortgagee, moved for a one week continuance of the confirmation hearing that had been scheduled for September 15, 1978. A hearing on the government's motion to continue was held on September 15, 1978. At that hearing, the Assistant United States Attorney acknowledged that there was no defect in any of the procedures leading up to the September 12, 1978 auction. The Government's request for a continuance was premised on the amount of the successful bid, "together with the fact that we have had representation made that *there is a substantial possibility* of an increased bid which will be substantially in excess of the appraised value . . . ." (emphasis supplied).[4]

To that contention, this court responded:

Ten people disagree. The people who had to put their money up disagree. We deal with appraisers all the time. What it comes down to is the market price controls. *The appraisers help us short of a sale. The best evidence of what value is, is when you get an arm's length purchase and sale. That's the best evidence of value I know.*

In response, the Assistant U. S. Attorney stated:

[W]e're merely asking for a continuance to determine whether we should or should not object to the confirmation.

This court rejected the request for continuance, stating in part:

This bidder evidently went down there in good faith, took his chances with ten

1. We therefore vacate the order of confirmation and remand this case to the district court for action not inconsistent herewith. Most probably such action will take the form of ordering a new sale but we refrain from giving explicit directions, since we think the district court should retain discretion to take appropriate action, not inconsistent herewith, in light of any changes in circumstances or additional facts that may be brought out.
   *Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13, 16 (1st Cir. 1978).

2. An upset bid is a bid which is filed following the first judicial sale and which is in excess of the highest bid offered at that sale. In most instances the bid is filed prior to the hearing to confirm the sale. *See, e. g., Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1188 (5th Cir. 1977) ("Until confirmation, a sale in admiralty may be set aside at any time, . . . ."); *American Tramp Shipping & Development Corp. v. Coal Export Corp.*, 276 F.2d 570 (4th Cir. 1960).

3. The standard relied upon by the Court of Appeals in vacating the court's confirmation order was that "if there are very major disparities between the high bid at the sale and both the appraised value and upset bid, confirmation should be withheld . . . ." 585 F.2d at 16.

4. Neither the Government nor any other creditor elected to protect themselves by bidding in at the sale.

other people who bid, and he got it. Now the fact that an appraiser had different ideas as to value than the ten people who had to put their own money up is interesting but not controlling. If you get any indication that there was some fraud or chicanery, . . . let me know and I think I would have the inherent power to set aside a sale that was fraudulent. If it is a fact that someone went down there and got a heck of a bargain, that's not a basis to set aside. He's entitled to rely on the representations made to him; if he bid fair and square he'd get it if he were the high bid, and he did and he got it.

The Government appealed, and on September 19 successfully sought a stay of this court's confirmation order from the Court of Appeals. On September 20, 1978, Judge Campbell held a hearing on behalf of the Court of Appeals in a conference room, during which a number of factual representations were made to him by counsel. Referring to that hearing, Judge Campbell's September 29, 1978, remand opinion stated:

[I]t was represented by the Government that a party who did not attend the judicial sale, having now inspected the vessel, had made a firm offer of $50,000 for it. . . . The upset bidder purportedly did not submit a bid at the auction because he did not develop a need for a vessel of this type until the last minute

. . . .

585 F.2d at 14.

The Government's representation was contrary to fact. At the time of the hearing before Judge Campbell, no firm offer in any amount, let alone $50,000, had been made for the M/V Heron after the $7500 bid by Sanchez. Contrary to the representations made to Judge Campbell, therefore, there was no "upset bidder."

Further, there was no representation by the Government to this court at the confirmation hearing that "subject to an inspection currently underway, it had a *likely* upset bid in excess of $25,000." 585 F.2d at 15 (emphasis supplied). The Government's representation to this court at hearing was that "there is a substantial possibility of an increased bid which will be substantially in excess of the appraised value . . . ." [5]

As a matter of fact, there was no alternate bid for the Heron, in any amount from any source, prior to the confirmation hearing on September 15, 1978. The only bids received by the Government, as alternates to that of Sanchez, were filed on September 30 and October 9 for $25,000 and $30,000 respectively. These bids postdated this court's confirmation order by more than two weeks and were filed after the Court of Appeals remand order.[6]

The underlying facts concerning the so-called upset bid are as follows.

On September 12, 1978, David Kaplan, an attorney experienced in maritime law, appeared before this court to request that the sale of the M/V Heron scheduled for that day be continued. Kaplan represented that certain foreign investors might be interested in bidding on the vessel. This court agreed to a continuation of the sale, subject to the assent of all parties to the foreclosure proceedings and all bidders at the sale. Kaplan went to the site of the sale and inquired whether there was any objection to a postponement. Sanchez objected. The sale took place as scheduled. Sanchez turned out to be the high bidder for $7500. Immediately thereafter, Kaplan asked Sanchez if he would be interested in selling the vessel. Sanchez responded affirmatively.

During the afternoon of the 12th, Kaplan telephoned Emmet Lewis, an attorney from

---

**5.** The term "likely" is synonymous with "probable." That there is a substantive difference between a probability and a possibility is clear beyond the necessity for citation.

**6.** This court views its duty upon remand as essentially retrospective—to determine if there was even a substantial likelihood of an upset bid at the time the Government requested that

confirmation be postponed. To do otherwise would be to ignore the reasonable expectations of the high bidder, thereby impairing public confidence in the regularity of judicial sales. As Judge Campbell noted, "It is important, in the ordinary case, to honor the expectations of those bidding at the sale." 585 F.2d at 16. There is nothing extraordinary about this case.

the U. S. Department of Justice representing the Government in this matter. Kaplan had spoken with Lewis earlier in the day to determine whether the Government objected to a continuance of the sale. The purpose of his second conversation of the day with Lewis was to inform him that Kaplan's principals were still interested in purchasing the Heron, but that a firm figure could not be proffered until his principals had a chance to inspect the vessel. The following day, September 13, an associate of Kaplan's informed Lewis that Kaplan authorized the Government to represent to this court that his principals would be prepared to bid substantially in excess of $25,000 for the Heron, assuming an inspection proved satisfactory.

At the September 15 confirmation hearing, the conversation between Lewis and Kaplan's associate served as the foundation for the Government's assertion that "we have had representation made that there is a substantial possibility of an increased bid which will be substantially in excess of the appraised value . . . ." This court was unpersuaded by the Government's eleventh hour proffer of a possible improved bid. The Government's request for a continuance was denied, and the sale was confirmed.

Following the confirmation, Sanchez towed the Heron from Boston to his dock in New Bedford. Sometime thereafter, Sanchez told Kaplan that he was about to begin cutting up the vessel for scrap. Perturbed by these remarks, Kaplan hastened to New Bedford to try to negotiate a deal with Sanchez, having been forewarned by Lewis that the Government had requested a stay of the confirmation from the Court of Appeals. On the afternoon of September 19, 1978, Kaplan telephoned Lewis and advised, "I have just bought the vessel for $50,000." This conversation occurred shortly after the

Court of Appeals had granted a 24 hour stay, and had scheduled a further hearing for September 20, 1978.

At the September 20 hearing, the Government represented to Judge Campbell that a firm $50,000 bid for the Heron had been made. 585 F.2d at 14. The alleged $50,000 bidder was Kaplan. In fact, however, Kaplan had not made a firm bid to either the Government or Sanchez for the Heron. What Kaplan had done was to pay Sanchez $5000 for an option to purchase the Heron for $50,000. That option agreement was in writing. It was available at the time of Judge Campbell's September 20, 1978, hearing, but was not brought to his attention.[7]

Further, the Government's brief, presented to Judge Campbell for his September 20 hearing, represented that, 1) a prospective purchaser had offered to buy the vessel from Sanchez; 2) that prior to this time, the same prospective purchaser had promised the Government that he would submit a firm written bid "substantially in excess of $25,000," assuming that the vessel was in satisfactory condition; and 3) that the vessel had been appraised for $25,000 scrap and $100,000 for use as a drilling ship.

All of these factors were emphasized by Judge Campbell in his opinion.

At the hearing on the stay, it was represented by the Government that a party who did not attend the judicial sale, having now inspected the vessel, had made a firm offer of $50,000 for it. 585 F.2d at 14.

Given an appraised value 200% greater than the sale price and the likelihood of an upset bid at least three times larger than the sale price (now appearing to be seven times greater), the district court exceeded its discretion in refusing even a

---

7. In relevant part, the contract between Sanchez and Kaplan stated:

"Kaplan" agrees to pay five thousand ($5,000) dollars upon the signing of this agreement to be credited to the selling price if "Kaplan" takes title to the said vessel in or within fifteen (15) days.

If "Kaplan" elects not to take title to the vessel as stated above, the $5000 deposit shall be retained by "Sanchez" as liquidated damages and no further cause of action shall be brought by either Party.

modest extension and in confirming the sale without further inquiry.

585 F.2d at 16.

Contrary to the assertions made orally and by brief to Judge Campbell, the evidence presented at hearing is uncontroverted that there was never an offer of $50,000, or any other price, made to either the Government or Sanchez for the Heron. All that Kaplan did was pay Sanchez, not the Government, $5000 for an option to purchase the Heron for $50,000. Kaplan was, and is, under no obligation to consummate the purchase.

Moreover, the record now establishes clearly that the Government's representation to this court on September 15, as to the possibility of an upset bid, was evasive and certainly inconsistent with representations made to Judge Campbell. At the hearing on the confirmation of the sale on September 15th, the Assistant United States Attorney told this court there was "a substantial possibility of an increased bid which will be substantially in excess of the appraised value . . .." Language contained in the motion to continue the confirmation date, filed September 14, stated that if a survey of the vessel indicated it to be in acceptable condition, interested purchasers would be prepared to make a firm upset bid of $25,000. This language suggested a greater likelihood of an upset bid than the representations of the Assistant United States Attorney made the next day at the confirmation hearing.

The record is now clear that the Government did not represent to this court on September 15, 1978, that "within a week's time it would be able to present the court with an 'upset' bid in excess of $25,000." 585 F.2d at 14. Nor was it represented that "subject to an inspection currently underway, it had a likely upset bid in excess of $25,000." 585 F.2d at 15. To the contrary, the evidence demonstrates that any possible upset bid was not conditioned simply upon a favorable inspection of the vessel. Kaplan's principals inspected the Heron on September 14 and September 15, a circumstance this court was not informed of at the September 15 hearing. Despite these apparently favorable inspections, Kaplan, the "likely upset bidder," has yet to come forward with a firm offer at any price, let alone either $25,000 or $50,000.

As of September 15, the date of the confirmation hearing, the Government's only basis for predicting an upset bid was the vague oral statement of a former law partner of an attorney who was attempting to purchase the vessel for certain undisclosed foreign buyers. As Judge Campbell suggested in his remand opinion, an evasive upset bid, coupled with an undocumented appraisal, would not be sufficient to set aside a confirmation of sale. Judge Campbell cited a recent 5th Circuit case, *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183 (5th Cir. 1977), as an example of a case involving an "evasive" upset bid.

In *Wong Shing*, the court declined to set aside a district court's confirmation of an auction sale to the highest bidder ($610,000). There had been some evidence of a potential upset bid more than twice that of the successful bid, and that the fair market value of the vessel was three times greater than the successful bid. Central to the 5th Circuit's decision was the evasive character of the potential upset bid. There, an attorney representing an undisclosed syndicate, had indicated that, subject to an inspection, his clients would be willing to pay "in excess" of a million and a half dollars for the vessel. 564 F.2d at 1188. That factual pattern is materially indistinguishable from the underlying circumstances in this case.

This court concludes, therefore, that there was never a likely upset bid for the Heron. At most, there was an expression of interest in the Heron after it had already been sold to the high bidder at a public auction that was conducted without defect. Any evidence of an upset bid which the Government could have presented in support of its motion to continue would have been evasive under the *Wong Shing* analysis.

## II.

### The Appraised Value

An additional factor relied on by Judge Campbell in his remand opinion was the

facial disparity between the Government's presale appraisal of the Heron and the high bid at auction sale.

> [T]here was a substantial disparity both between the appraisal and the sale price, and between the likely upset bid and sale price.

585 F.2d at 15.

In March of 1978, this court, at the Government's request, appointed Mr. Raymond Kershaw to appraise the M/V Heron in preparation for its judicial sale. Kershaw valued the Heron at $25,000 for scrap and $100,000 as an operating vessel. At the time of his appraisal, Kershaw was unaware that the Heron had formerly been part of the National Defense Reserve, and was consequently subject to certain use restrictions: 1) a buyer could not use the vessel as a means of transporting passengers or cargo; or 2) a buyer, within twenty-four months after the date of delivery, would have to scrap the hulls of the vessel.

The Government had also been unaware that the Heron was subject to these restrictions and, on August 18, 1978, moved this court to impose them as a condition of the sale scheduled for September 12, 1978. The motion was granted. There is no dispute that the vessel was sold subject to the restrictions.

It is now clear, after hearing, that the Heron has no value as an operating ship. In fact, the government concedes that it is doubtful whether there is an active market for the vessel for this purpose. Consequently, the Heron has practical value only as scrap.

Three appraisers testified as to value. Kershaw and Harold Chait were called for the Government. Robert Vorel was appointed by this court as an impartial expert. Before evaluating their testimony, it is helpful to consider several relevant characteristics of the the ship scrapping industry.

The process of buying, scrapping and marketing the saleable parts of a ship like the Heron is referred to in the trade as "ship-breaking." In order to make a profit, a ship-breaker must have the resources to purchase, remove, scrap and market. San-chez, the high bidder, had these resources to at least some degree. The number of ship-breaking operations having comparable resources necessary to scrap a vessel like the Heron is extremely limited. Kershaw could only recall one operation in the Boston area that scrapped vessels, and he was not entirely sure that it was still in the shipbreaking business. In fact, there is only one company on the East Coast—Boston Metals of Baltimore, Maryland—that is in the business of scrapping, advertising and selling on a national scale.

Ship-breaking is a speculative business. Chait, an employee of Boston Metals, was the Government's second appraiser. He testified that he estimates scrap value "by the seat of my pants," and that an appropriate measure of fair market value for a vessel like the Heron would be a sum that would yield a rate of return of 200% after the scrapped parts had been resold.

The speculative character of ship-breaking is also underscored by the absence of a predictable market for the scrapped materials that are to be resold. As noted above, Boston Metals is the largest ship-breaker on the East Coast. It has a national marketing and advertising program and an international reputation. Yet even Chait, an employee of Boston Metals, was not prepared to state that his company, if notified, would have been prepared to make a bid for the Heron. As he stated: "It would depend on market conditions." Vorel, the appraiser appointed by this court, felt that it was "purely speculative" as to whether there was any market for some of the equipment on the Heron. Kershaw felt the sale of some of the Heron salvage "would be slow." Chait acknowledged that some of the equipment might have to be held for a year and a half.

Kershaw estimated a scrap value of $25,000 for the Heron. By his own admission, this was a "rough figure." Unlike the other two appraisers in this case, Kershaw did not break down his estimate on an item by item basis. Additionally, he did not factor in the cost of taking the vessel apart, keep-

ing it in a berth until all scrap was sold,[8] and, if necessary, sinking the hull. Although Kershaw felt that a $25,000 purchaser might be able to sell the scrap of the Heron at a healthy profit, his testimony on this point was vague. All in all, the court was not persuaded by Kershaw's testimony and, therefore, rejects his scrap appraisal figure of $25,000.

Chait, executive vice-president and general manager of Boston Metals, appraised the Heron's scrap value at $33,000 [9] after a one-hour inspection on the morning of November 14, 1978. He concluded that the Heron's machinery could be put in good working order with minor repairs. Chait, however, did not conduct any tests of the machinery.

While Mr. Chait's figure of $33,000 might well be indicative of what a large company like Boston Metals might pay for the Heron, it is not a reliable indicator of fair market value at a judicial sale. First, Chait's analysis did not include any allowance for storage costs. As he stated: "I can absorb the storage." While Boston Metals, the largest ship-breaker in the east, might well be able to "absorb" the storage costs, a smaller scale bidder would more likely arrive at a reasonable bidding price by factoring in some cost of storage.

Second, Chait's figures included the scrap value ($31,800) of the ferrous and nonferrous metals on the Heron. It is clear that this figure included the scrap value of the deck and hull, which Chait obviously felt could be sold profitably. In this respect, his testimony conflicts with the two other appraisers who testified that it would be unprofitable to cut up and scrap the deck and hull. This court finds it unlikely that any ship-breaker, other than Chait's company, could profitably cut up and scrap the deck and hull.

Finally, it is clear that Chait's appraisal was referenced primarily to what his large company could expect to make in profits from scrapping the Heron. He conceded that scrappers smaller than Boston Metals would not have the capacity to market the machinery with comparable success. Toward the end of his testimony, he expressed some doubt whether a ship-breaker like Sanchez could get the same prices he could, stating, "Mr. Sanchez basically is not in the marketing business."

Fair market value has been defined as what "a willing buyer would pay in cash to a willing seller." *United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). If the term is to have any meaning at all, it is clear that unique attributes of a particular potential purchaser may not be considered in determining fair market value.[10] To hold otherwise would restrict the pool of purchasers at judicial sales to only the largest or most sophisticated concerns. In the area of ship-breaking, the number of possible purchasers might well be limited to one—Boston Metals. The court finds that Chait's appraisal was too limited by its reliance on what profit Boston Metals could make on the Heron to be a sound basis for a finding of value by this court. It is, therefore, rejected.

---

8. The cost of keeping the Heron in a berth is substantial. When it was berthed in Boston, the charge was $50 per day.

9. Chait arrived at a scrap appraisal figure of $33,000. He did so by estimating the gross revenue from the sale at $129,750 and subtracted therefrom $38,500, his estimate of what it would cost to reduce the vessel to scrap. This left a figure of $91,250. He then applied a profit factor of approximately 200% to that figure in order to determine fair market value.

10. In *United States v. Miller, supra,* the Court set up guidelines for the determination of fair market value in the eminent domain area. The Court noted:

> [S]trict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case, as where the formula is attempted to be applied as between an owner who may not want to part with his land because of its special adaptability to his own use, and a taker who needs the land because of its peculiar fitness for the taker's purposes. These elements must be disregarded by the fact finding body in arriving at "fair" market value.

317 U.S. at 375, 63 S.Ct. at 280.

Vorel's testimony was most persuasive. His five page report evidenced a detailed knowledge of the value of marine equipment in general, as well as a careful analysis of the Heron in particular. Vorel concluded that the Heron had no value as an operating vessel. He also concluded that, under all the circumstances, the scrap value of the Heron was what a prudent purchaser was willing to offer on a given day. The approximate range of its scrap value, he felt, was between $7255.80 and $16,500.00. The low figure was based upon an analysis of scrap values on a per tonnage basis of several vessels listed in the June 15, 1978, Marine Engineering Log. The high figure was based upon an itemization of the value of the Heron's machinery.

Vorel's appraisal contained analysis not found in the reports of the other two appraisers. Unlike Chait, he felt that the condition of the machinery was "at best poor." Vorel arrived at this conclusion after learning that the vessel had been unattended for the past three years with no winterization or preventive maintenance having been performed. Facts such as these, to which a bidder at a judicial sale might well have access, are highly significant in determining fair market value in the setting of an auction sale where there is usually no opportunity for a bidder to start the machinery to see if it is functional. The parties have stipulated that there was no opportunity to test the equipment at the Marshal's sale of the Heron on September 12.

Additionally, Vorel noted in his report that during the three years that the Heron was stored at the Munro Drydock yard, it was continually advertised for sale and that only one party expressed any interest. His report also stated that if Munro Drydock, a company intimately familiar with the Heron, had the time to invest in a ship-breaking project, it would have been prepared to enter a bid of $10,000.[11]

An analysis of the three reports of appraisal leads this court to the following conclusions. Ship-breaking is a highly speculative venture with success dependent on such uncertain factors as unpredictable day to day need for used machinery, as well as the actual condition of the machinery on the vessel to be scrapped. Because of the speculative nature of ship-breaking, even the most sophisticated concern anticipates a 200% rate of return when deciding upon a reasonable bid. Additionally, the number of ship-breakers is extremely limited in light of the fact that the breaker must be in a position to provide a number of services, including towing, storage, scrapping and marketing. The court finds that Sanchez's bid was well within the range of expected bids for a vessel of this type, given the uncertain condition of its equipment. The court also concludes that the most accurate indicator of market value under the circumstances unique to this specialized field is exactly what the highest prudent bidder would be willing to offer on a given day.[12]

### III.

In summary, therefore, this court determines that the September 12, 1978 judicial

---

11. The court discounts any reliance placed by Vorel on the purchase by Boston Metals of three other vessels similar to the Heron at an average price of $12,000. Vorel's information, received from a source at Boston Metals, was apparently inaccurate, through no fault of his own. Chait testified that Boston Metals actually paid $26,666, $28,666 and $33,666 for these three vessels. There was no indication that these three vessels were left unattended for the same length of time as the Heron. In any event, Vorel's appraisal had sufficient independent basis to stand, irrespective of any reliance he may have placed on the figures given to him in error by Boston Metals.

12. In light of this finding, the Government's contention that the sale to Sanchez should not be confirmed because it now has two higher bids has no merit. Judge Campbell's opinion specifically stated that confirmation should be withheld only if "there are very major disparities between the high bid at the sale *and both* the appraised value and upset bid, . . . ." 585 F.2d at 16 (emphasis supplied). There was no disparity between Sanchez's timely bid and the only appraisal this court finds reliable, that of Vorel. The fact that higher bids were submitted long after confirmation is irrelevant to the issues of this case. *See also In re Gil-Bern Industries,* 526 F.2d 627, 629 (1st Cir. 1975).

sale was conducted properly; that Sanchez was the high bidder at $7500; that there was no upset bidder prior to confirmation; that Government representations as to an upset bid were inaccurate and evasive; that the Government's presale appraisal was unreliable; that Sanchez's bid was not in substantial disparity with the fair market value of the Heron at the time of the auction sale.

As Judge Campbell stated:

> The policy of inspiring confidence in sales under supervision of the court favors confirmation of a sale made to the highest bidder at a fairly conducted public auction.

585 F.2d at 14. Indeed, for this court to deny confirmation under the circumstances of this case, established after evidentiary hearing, might well be an abuse of discretion. *See In re Gil-Bern Industries*, 526 F.2d 627, 629 (1st Cir. 1975).

The order of sale to Edward Sanchez, Jr. is confirmed.

An order will issue.