**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, a body corporate,**

v.

**FIVE PARCELS OF LAND IN PRINCE GEORGE'S COUNTY, MARYLAND, Alfred L. Bennett, et al., and Unknown Owners.**

Civ. No. T–75–19.

United States District Court, D. Maryland.

July 18, 1979.

Michael J. Mitchell, Atty., Land Acquisition Section, Land and Natural Resources Div., U. S. Dept. of Justice, and Jerome J. Jani, Atty., Washington Metropolitan Area Transit Authority, Washington, D.C., for plaintiff.

George A. Brugger and Fossett & Brugger, Seabrook, Md., for defendants.

THOMSEN, Senior District Judge.

On January 9, 1975, Washington Metropolitan Area Transit Authority (WMATA) filed this action to condemn five parcels of land in Prince George's County, Maryland, to be used in the construction, maintenance and operation of its rapid rail transit system and related facilities necessary or useful in rendering transit service, or in activities incidental thereto. The owners of two of the parcels (hereinafter referred to as Parcels 1 and 2) agreed with WMATA to try the case with respect to those two parcels before the court without a jury.[1] When the two parcels are considered together, they will be referred to as the subject properties. When they are considered individually, they will be referred to as Parcels 1 and 2 respectively. They are so designated on the sketch accompanying this opinion. Parcel 1 contains 8.017 acres (351,556 sq. ft.); Parcel 2 contains 12.052 acres (524,997 sq. ft.). Together they contain 20.069 acres (876,553 sq. ft.).

WMATA paid into court $964,000 as its estimated just compensation. The owners claim that the two parcels were worth $1,750,000, without a claimed enhancement of $250,000 in the value of Parcel 1 based upon the owners' contention that WMATA did not originally intend to take all of Parcel 1. WMATA disputes that contention. No claim for enhancement of any part of Parcel 2 has been made.

WMATA operates a rapid rail transit system, partly underground and partly above ground, in the District of Columbia, in two Maryland counties (Prince George's and Montgomery) and in two Virginia counties

---

1. The claims with respect to the other three parcels, with different owners, have been settled.

(Arlington and Fairfax). This case deals with two adjacent parcels (the subject properties) now being used for the northeastern-most station of the Prince George's County line, now known as the New Carrolton Metro Station,[2] and related parking. The subject properties are located in the area generally referred to as the Ardmore Triangle, bounded on the east by the Capital Beltway (I–495), on the south by the John Hanson Highway (U.S. Route 50, the main road between Washington and Annapolis) and on the northwest by the tracks of the Pennsylvania Railroad, later Penn Central and its Trustees, now owned by Amtrak and used by it and by Conrail.

A sketch prepared from several of the exhibits admitted in evidence is filed herewith as Appendix 1.

On the day before the trial began, the court, accompanied by counsel for the respective parties, visited the subject properties and all properties used by witnesses for either side as comparable sales, walked over Parcels 1 and 2 and portions of the immediately adjacent land, and was driven over the various roads which provide access to the subject properties and to the sites of all the sales claimed by either side to be comparable.

The parties stipulated the authenticity of 190 exhibits, 173 of which were admitted in evidence or identified. Each side offered in evidence maps and plats, some showing the subject properties in relation to various portions of the surrounding area, some showing the "comparable sales" relied on by the several appraisal witnesses, some showing the topographical features of the subject properties and adjacent properties, some showing what the owners claim to have been likely plans of development of the subject properties in the absence of a taking, others showing problems in connection therewith and possible solutions of those problems, which included water, sewer, internal roads and access to and from the subject property from and to Route 50 and the Beltway.

## I. Facts

Planning for the extension of the Metro facilities into Prince George's County began in the early sixties. By the late sixties it was planned that after reaching a point several miles southwest of the Ardmore Triangle, the line would run along the southeast side of the railroad tracks, would have its first station at Cheverly, the second at Landover and the terminal station (accompanied by a storage yard) in the Ardmore Triangle. A hearing was held on April 28, 1971, to present the proposed alignment, station location and access, and to receive comments thereon. The notice of the public hearing (Stipulated Exhibit 4.0) stated that maps, drawings and other pertinent information were available at the WMATA offices in Washington and Silver Spring. That information included a "General Description," part of which dealt with the proposed station in the Ardmore Triangle and "Coordination with the Hi-speed Metroliner Station." Stipulated Exhibit 4.0 contained, inter alia, a "proposed site plan not final, dated 3–71" for that station, showing an "outline of the area which may possibly be affected," which indicated that all of the subject property northwest of the proposed Garden City Drive (i. e., all of Parcel 1 and almost all of Parcel 2) would probably be taken.

At a meeting early in December, 1971, followed by a letter from WMATA's Director, Office of Real Estate, to the representative of the owners of the subject properties, they were again advised that all of Parcel 1 and substantially all of Parcel 2 (except an irregular bit south of the proposed Garden City Drive) would be taken. A letter from the owners' representative to WMATA, sent shortly thereafter, indicated that this was clearly understood by the owners. In May, 1972, WMATA indicated to the owners' representative that a part of Parcel 1 might be taken by Amtrak rather than by WMATA as part of the area to be used for parking facilities, because it was evident that some Amtrak passengers might use whatever parking facilities were

---

2. Formerly sometimes called the Ardmore station.

available at the Ardmore Metro station. The suggestion that Amtrak would take part of Parcel 1 was abandoned shortly thereafter.

Negotiations continued. A meeting was held on August 12, 1974, between WMATA negotiators and representatives of the beneficial owner of Parcels 1 and 2 (Anthony Izzo), who stated that they had no authority to make a binding agreement, but would have to wait until Izzo returned from Italy on August 28. At that meeting the WMATA negotiators indicated that all of Parcel 2 would be taken, but that only a part of Parcel 1 (about 3 of the 8 acres) would be taken. Figures were discussed.

One or two days later, the Director of WMATA's Office of Real Estate learned what his subordinates had done, stated that WMATA's real intention was to take all of both Parcels 1 and 2, and called a new meeting with Izzo's representatives, which was held on August 19, 1974, one week after the first meeting. At that meeting it was made clear to Izzo's representatives that WMATA intended to take all of both Parcels 1 and 2, and that the proposal to take less than all of Parcel 1, made at the previous week's meeting, had been a mistake. The parties were unable to reach an agreement as to price, and the present condemnation proceeding was instituted on January 9, 1975.

The court finds as fact that it was or should have been clear to all interested parties after the April 1971 hearing, and certainly after the December 1971 meeting, that WMATA had decided on the location of the station in the Ardmore Triangle, and that all of Parcel 1 and most of Parcel 2 would probably be taken for the station and associated parking. Because of the possible relocation of the Amtrak station nearer to the Metro station, there was discussion for a time between April 1971 and August 1974 that Amtrak rather than WMATA might buy a part of Parcel 1 for parking facilities, which would obviously have been used also by some Metro passengers. The final decision was to adhere to the April 1971 plan of having WMATA take all of Parcel 1.

Sometime before 1975 WMATA decided to take the small portion Parcel 2 lying south of the projected Garden City Drive.

The court finds that the clear preponderance of the evidence shows that at all material times, except possibly during the one week between August 12 and August 19, 1974, the owners of the subject properties knew that all of Parcel 1 (as well as all or almost all of Parcel 2) would probably be taken for the Metro station and related parking.

The law controlling the issue of enhancement and the court's ultimate findings and conclusions on that issue are set out in IV, below. No claim for enhancement has been made with respect to any portion of Parcel 2.

## II. The Ardmore Triangle

The Ardmore Triangle has never had direct access to or from the Beltway. A road known as Cobbs Road ran and still runs along the east and south borders of the Triangle from the Amtrak station to the southwestern corner of the Triangle, where there was ready access to Route 50 westbound and from Route 50 eastbound. Access from Route 50 westbound and to Route 50 eastbound followed a very circuitous route. There was good visibility of the subject property from the railroad line and from Route 50, and variable visibility from the Beltway.

The ground in the western half of the Triangle, which includes the subject properties, sloped down, abruptly for a short distance, then gradually, from the railroad tracks across the two subject properties to their southeastern boundaries, most of which were just within the upper limits of a flood plain which, together with a little stream southeast of the subject properties, occupied a considerable stretch of the southern portion of the Triangle. The slope, with some accompanying drainage, would not have prevented the development of the subject properties for warehouse or office use, but would have presented some problems, especially with respect to basements.

The only buildings in the Triangle before the date of taking, January 9, 1975, were: (1) the Amtrak station in the northern corner, (2) an interstate truck terminal (which included, inter alia, a large garage and a service station with repair facilities) in the southwestern corner of the Triangle, adjacent to Parcel 1 of the subject property, and (3) a storage yard southeast of the subject property.

The southeastern portion of the Triangle, some 83 acres, between a third and a half of its total area, was sold in 1972 by Manor Realty Corp. (a subsidiary of Penn Central) to Lanham Corp., then sold by Lanham to Shell Oil Co., subdivided and portions on new roads sold for industrial purposes after the date of taking herein.

No other sales in the Triangle have been used as comparables by either side. Some properties therein have been purchased or condemned by WMATA for right of way and support facilities, including parking and storage of cars.

The court agrees with the owners' argument that the highest and best use of Parcels 1 and 2 in the absence of Metro was for warehouse development, either as one unit or as several units. The problems presented by such development would have limited some of the proposals advanced by the witnesses for the owners, and have been considered in valuing the two parcels.

### III. Valuation

Almost all of the sales cited by the valuation witnesses called by either party reflected, to a greater or lesser extent, the prospect of Metro service to the Cheverly, Landover and New Carrolton stations, which became a reality in 1978. Many of them also reflected the problems of development in Prince George's County, including sewer and water service and the policies which were adopted by the County Government to solve or ameliorate those problems, which were present in varying degrees in the Triangle.

Twenty-five sales in all were discussed by the appraisal witnesses called by one side or the other. None was fully comparable; all have been considered and given varying weight by the court, except one which both sides agreed was entitled to little or no weight.[3] They ran from 70¢ per square foot to $3.50 per square foot, depending upon many factors, including date of sale, location on a paved road, availability of water and sewers, the size and topography of the tract and the probable cost of development.

Plaintiff objected to the admissibility and consideration by the court of sales after the date of taking. As noted above, all or almost all of the sales cited by either side reflected to a greater or lesser degree the prospect of Metro, in its early stages in 1968 and in the later stages after the announcement of the specific locations in 1971. Under all the circumstances of this case, the court concludes that such sales may be considered, with due allowance for the date of the sale as well as of the many other factors which distinguished, in varying degrees, each sale relied on by the respective parties.

There is no absolute rule which precludes consideration of subsequent sales. The general rule is that evidence of "similar sales in the vicinity made at or about the same time" is to be the basis for the valuation and evidence of all such sales should generally be admissible, *United States v. 5139.5 Acres of Land, etc.,* 4 Cir., 1952, 200 F.2d 659, 662; 1 Orgel, Valuation Under Eminent Domain, § 139 (2d Ed. 1953), including subsequent sales. * * * In every case it is a question of judgment as to the extent of this danger and, particularly where a judge is sitting without a jury, it would seem the better practice to admit the evidence and then to weigh it having due regard for the danger of artificial inflation. *United States v. 63.04 Acres of Land,* 245 F.2d 140, 144 (2 Cir. 1957).

The court's findings with respect to the value of the subject properties would not be different if the sales after the date of taking were disregarded.

---

3. Spadaro to C C & F Maryland, Inc., Land Sale 11 in Moore's appraisal report.

■ After considering all of the evidence in the case and the applicable law, the court finds and concludes that just compensation for Parcels 1 and 2, without any "enhancement" with respect to Parcel 1, as claimed by the owners, was $1,314,820 ($1.50 per square foot).

### IV. The Issue of Enhancement

The leading case on the subject of enhancement is *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), where the Court said, at 376–77, 63 S.Ct. at 281:

> If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.
>
> The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to · it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

That passage was quoted with approval in the later case of *United States v. Reynolds*, 397 U.S. 14, 17, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970).

The principles stated in *Miller* were applied in *John L. Roper Lumber Co. v. United States*, 150 F.2d 329 (4 Cir. 1945).

The owners in the case at bar cited *United States v. 959.68 Acres of Land, etc.*, 415 F.2d 401 (3 Cir. 1969), as authority for the proposition that it is not necessary to have two separate takings in order to have an allowance for enhancement. That may be true; but after considering earlier cases the controlling principle was stated by Chief Judge Hastie, as follows:

> However, in both cases the critical issue was whether it seemed probable when the project was announced and undertaken that it might be so developed and enlarged as to include land above the 920 level." 415 F.2d at 403.

In the instant case, after considering all the evidence, the essential parts of which are set out in I, above, this court finds that it was highly probable when the project was announced and when the public hearing was held in April 1971, and at all material times thereafter that the project would be so developed as to include all of Parcel 1. The events during the one week period from August 12 to August 19, 1974, do not require or justify a different finding. As noted above, no claim for enhancement is made with respect to Parcel 2.

■ The court therefore concludes that the owners are not entitled to have five acres of Parcel 1 valued for the purposes of this case on the assumption that only Parcel 2 and three acres of Parcel 1 were intended to be taken by WMATA during the relevant period before January 9, 1975, the date of taking. It follows that they are not entitled to the "enhancement" of $110,000 or $250,000 included in the valuations of the subject properties by their appraisal witnesses.

However, to avoid the necessity of a retrial if the court's findings and conclusion

on this point are found to be erroneous on appeal, the court finds that the claimed increase in the value of those five acres of Parcel 1 would have been $100,000. The larger amounts testified to by the owners' appraisal witnesses assume that the five acres would have been used or sold for use as an office building. That is possible, of course, but the proximity of the Associated Transport facility immediately adjacent to the five acres, and the noise resulting from the Metro trains as well as the passenger and freight trains on the Amtrak line, along with the development problems which had always existed with respect to the subject property, would have had a dampening effect on the price which could have been obtained from a prospective purchaser and would have offset to some extent the proximity to the Metro station.

Judgment will be entered in accordance with this opinion. Counsel should agree upon its form and content.

Appendix A